157 So. 224

## BIRMINGHAM BAPTIST HOSPITAL v. CREWS.

### 6 Div. 468.

Supreme Court of Alabama.

Oct. 11, 1934.

Rehearing Denied Nov. 8, 1934.

Harris Burns, of Birmingham, for appellant.

Chas. W. Greer and Taylor & Higgins, all of Birmingham, for appellee.

FOSTER, Justice.

No question is raised on this appeal in respect to the pleading. The complaint is very general, and gives no idea of the specific wrong sought to be charged. Plaintiff sued as the father of a minor child for its wrongful death under authority of section 5695, Code.

The brief of counsel is more specific than the complaint in describing the wrong claimed to have been done by defendant. It avers that the contention is that "the child's death was accelerated by the negligence of the hospital attendants in and about the treatment which they gave. We do not contend that her death was caused or accelerated by failure to receive her into the hospital. We do say, however, that after receiving her and after giving her proper treatment for awhile, that they cruelly abandoned her when her con-

dition demanded that she remain in bed, continue to receive treatment and be kept where oxygen could be given in case of a heart attack, and sent her into rain and cold on a seven mile trip to die."

Defendant is a private corporation, and not a public institution, and owes the public no duty to accept any patient not desired by it. In this respect it is not similar to a public utility. It is not necessary to assign any reason for its refusal to accept a patient for hospital service. But it was shown that "it was against the rules and regulations of the hospital to admit any contagious disease, if diagnosed as such before admittance." Plaintiff's minor child had diphtheria when he took her to the hospital. It was shown to be highly contagious, and defendant owed plaintiff or the child no duty to accept her for treatment, and may have made itself liable to other patients for so doing. Gadsden General Hospital v. Bishop, 209 Ala. 272, 96 So. 145.

The issue, within the complaint, as stated in brief, is not based upon improper treatment in the hospital, but that it received her for hospital service and then wrongfully refused to render that service, and required her to be carried away, at a time when she needed it, resulting in an acceleration of her death. The evidence must show that defendant became due to render the service by having undertaken to provide it, when there was otherwise no duty to do so, or by having rendered a treatment in an emergency, without undertaking to provide full hospital service, but that such treatment was known to be likely to and did create a condition which was extremely dangerous unless further partial (at least) hospital service was rendered until that hazard which defendant voluntarily created was passed, and that the death of the child was accelerated by the failure of defendant to discharge such duty.

With respect to the first postulate in the contention as outlined, we think the evidence, taken most favorably for plaintiff, does not justify a finding that defendant undertook to render hospital service except such as may have been rendered reasonably necessary by the treatment which was given, as embraced in the second postulate above.

The evidence is without dispute that plaintiff carried his daughter, two and one-half years old, into the hospital in his arms on a cold rainy day; that she then had a desperate affliction of diphtheria. He told them that he wanted her to have attention. The house doctor (second in authority) came immedi-

ately and carried her into the emergency room, seeing she was very sick, and saying he thought it was diphtheria. None of the attachés said anything to indicate an acceptance of her for full hospital service. It is therefore only by inference from their conduct if she was so accepted. The house doctor, Dr. Stock, made a swab of her throat in plaintiff's presence in the emergency room, and took a specimen from the throat, went to his laboratory, and examined it under the microscope. While he was out the nurse was administering oxygen. In five or ten minutes Dr. Stock returned, examined her again, and administered 20,000 units of antitoxin, saying it was for diphtheria. He watched her a while, she was still receiving oxygen, when she relaxed, the color came to her face, and the stare left her eyes. Then Dr. Long, the head house physician, came in, followed by Dr. Barrett, the superintendent. The three had some conversation, when Dr. Barrett said, "Go ahead." Then they gave her another shot of 20,000 units; all the time administering oxygen. Soon after that Dr. Barrett told plaintiff he would have to remove the child from the hospital; that they could not keep patients so afflicted with a contagious disease; that he had done all he was going to; and that they would have to leave. "The child's condition had improved quite a bit." The child was wrapped up well, taken by plaintiff in his arms in his closed car to his home across the city, about seven miles, as he had brought her. The weather was cold and raining going and returning. The child died about ten or fifteen minutes after reaching home. Dr. Stock told plaintiff to have his family physician at home when he reached there, and gave him a memorandum of what had been done. Plaintiff had Dr. Greene Smith reach his home soon after they arrived, but she died in about five minutes after he came, and was in a dying condition when he arrived. He did nothing for her.

Our judgment is that the only fair inference from these facts is that the treatment given was but an emergency treatment as the only hope in a desperate situation, administered as soon as the trouble was diagnosed, and that, since it is admitted to have been the appropriate thing to do in such emergency, it does not justify an inference that defendant undertook to do more than was immediately apparent as the only hope. We think that such treatment does not justify an inference that defendant undertook to render ordinary hospital service in violation of its rules, and so as to endanger the life or health of other patients.

To uphold plaintiff's contention, we assume that, if defendant did not propose to render hospital service, it should have sent the child away in a desperate condition without emergency treatment, when such treatment was available and provided the only hope of recovery. The willingness of defendant to provide such treatment should not be used to its prejudice for not violating its rules and endangering other patients.

It is clear to us that on that postulate defendant was due the affirmative charge, unless liability was otherwise inferable as upon the second postulate. We think that is dependent upon the inquiry of whether the treatment administered had a tendency so to weaken the heart of the child as that it should have immediate and constant attention to watch the effect and provide such treatment as the developments required, all in the emergency room; and then whether the heart was so weakened by the treatment operating on the disease as to accelerate her death as a proximate contributing cause.

Can the jury reasonably find that the treatment administered by defendant accelerated her death, when careful attention at the hospital after it was given would have prolonged her life? What effect upon her vitality did the antitoxin produce, as a probable result?

Defendant should not have brought about a dangerous condition as the natural result of its treatment without taking due care of such condition which it produced. The doctors all agree that it is proper for the patient to abstain from any physical exertion, and be at rest, with or without the antitoxin. But we cannot agree that this requirement is violated when the father of a small child well wrapped takes her in his arms to his home in an inclosed car, as he carried her there. Moreover, no reason is shown why he could not use an ambulance, whether that was suggested or not.

Dr. Greene Smith, plaintiff's physician, testified that he never had a case of diphtheria that developed a heart weakness unless it probably has been a case that died. None of the doctors testified that the antitoxin depresses the heart. On the other hand, Dr. Donald said that it does not have that effect. Dr. Heacock testified that "the antitoxin never has any untoward affect, and usually clarifies, counteracts the particular poison for which it is given. It sometimes produces a little rising temperature, but never any harmful one."

The treatise on "Diseases of the Ear, Nose and Throat," by Phillips, which plaintiff in-

troduced, states that: "The diphtheria toxins tend to produce a depressing effect upon the heart. Stimulants should therefore be commenced upon the first evidence of cardiac weakness." Again: "Evidences of cardiac weakness may appear at any time." This evidently means that such weakness is the frequent effect of the poison of the disease, and not the effect of the antitoxin.

We find in the record no evidence that the antitoxin created a condition which was a proximate contributing cause of the immediate death, or such condition as to stimulate attention not otherwise necessary in the treatment of the disease.

Plaintiff does not show that he or his child had any legal right to further hospital or other service at the hands of defendant. We think the affirmative charge was due defendant.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.