WILMINGTON GENERAL HOSPITAL, a corporation of the State of Delaware, Defendant Below, Appellant, v. DARIUS M. MANLOVE, Administrator of the Estate of Darien E. Manlove, Plaintiff Below, Appellee.

(*October* 12, 1961.)

SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and CAREY, Judge, sitting.

*Rodney M. Layton* (of Richards, Layton and Finger) for appellant.

*Joseph T. Walsh* for appellee.

Supreme Court of the State of Delaware, No. 20, 1961.

SOUTHERLAND, C. J.:

This case concerns the liability of a private hospital for the death of an infant who was refused treatment at the emergency ward of the hospital. The facts are these:

On January 4, 1959, Darien E. Manlove, the deceased infant, then four months old, developed diarrhea. The next morning his parents consulted Dr. Hershon. They asked whether the medicine they had for him was all right and the doctor said that it was. In the evening of the same day Mrs. Manlove took the baby's temperature. It was higher than normal. They called Dr. Hershon, and he prescribed additional medication (streptomycin), which he ordered delivered by a pharmacy.

Mrs. Manlove stayed up with the child that night. He did not sleep. On the morning of January 6th the parents took the infant to Dr. Hershon's office. Dr. Thomas examined the child and treated him for sore throat and diarrhea. He prescribed a liquid diet and some medicine.

When Mr. Manlove returned home that night, the baby's condition appeared to be the same. His temperature was still above normal, and again he did not sleep during the night.

On the morning of January 7th (a Wednesday) his temperature was still above normal—102. Mr. and Mrs. Manlove determined to seek additional medical assistance. They knew that Dr. Hershon and Dr. Thomas were not in their offices on Wednesdays, and they took their infant to the emergency ward of the Wilmington General Hospital.

There is no real conflict of fact as to what occurred at the hospital. The parents took the infant into the reception room of the Emergency Ward. A nurse was on duty. They explained to the nurse what was wrong with the child, that is, that he had not slept for two nights, had a continuously high temperature, and that he had diarrhea. Mr. Manlove told the nurse that the child was under the care of Dr. Hershon and Dr. Thomas, and showed the nurse the medicines prescribed. The nurse explained to the parents that the hospital could not give treatment because the child was under the care of a physician and there would be danger that the medication of the hospital might conflict with that of the attending physician. The nurse did not examine the child, take his temperature, feel his forehead, or look down his throat. The child was not in convulsions, and was not coughing or crying. There was no particular area of body tenderness.

The nurse tried to get in touch with Dr. Hershon or Dr. Thomas in the hospital and at their offices, but was unable to do so. She suggested that the parents bring the baby Thursday morning to the pediatric clinic.

Mr. and Mrs. Manlove returned home. Mrs. Manlove made an appointment by telephone to see Dr. Hershon or Dr. Thomas that night at eight o'clock.

At eight minutes past three o'clock in the afternoon the baby died of bronchial pneumonia.

The foregoing facts are taken mainly from the deposition of the plaintiff.

Plaintiff, as administrator, brought suit against the hospital to recover damages for wrongful death. The complaint charged negligence in failing to render emergency assistance, in failing to examine the baby, in refusing to advise the interne about the child or permit the parents to consult him, and in failing to follow reasonable and humane hospital procedure for the treatment of emergency cases. Defendant

answered denying negligence and averring that, pursuant to its established rules and community practice, plaintiff was advised by its employee that it was unable to accept the infant for care.

Discovery proceedings were taken by both parties, eliciting the facts set forth above. Defendant then moved for summary judgment, and attached an affidavit from the nurse on duty when the infant was brought to the hospital. Her statement concerning the refusal of treatment is:

"I then told Mr. and Mrs. Manlove that the rules of the hospital provided that in such cases, where a person is under attendance and medication by a private doctor, *and there is no frank indication of emergency,* no treatment or medication may be given by doctors employed by the hospital until the attending doctor has been consulted." [Emphasis supplied.]

The issues made by the parties below were in effect two:

1. Whether the hospital was under any duty to furnish medical treatment to any applicant for it, even in an emergency;

2. Whether the existence of an apparent emergency was a material fact in dispute.

The holding of the court below may be summarized as follows:

1. The hospital is liable for refusal to furnish medical treatment in an emergency because it is a quasi-public institution, being the recipient of grants of public funds and of tax exemptions.

2. There was some evidence of an apparent emergency because (1) of death following in a few hours, and (2) of the child's symptoms as recited by the nurse.

Hence the court denied the motion. The hospital appeals.

We take a somewhat different view of these questions from that of the learned judge below.

First, as to the status of the defendant hospital.

It was assumed by both parties below that the hospital was a private hospital and not a public one—that is, an institution founded and controlled by private persons and not by public authority. The trial court disagreed, finding a quasi-public status in the receipt of grants of public money and tax exemptions. See, for example, the Act of 1959 (52 *Del. L.* c. 159) granting certain hospitals, including defendant, the sum of $550 per bed; and the act authorizing the Levy Court of New Castle County to appropriate public funds to certain hospitals, including defendant, for the care of indigent persons. 9 *Del. C.* §§ 1801-1806. For the exemption of its property from county taxation see 9 *Del. C.* § 8103.

Hence, the court concluded, liability may be imposed on the defendant in an emergency case.

We are compelled to disagree with the view that the defendant has become a public (or quasi-public) hospital. It is admitted (although the record does not show it) that it is privately owned and operated. We find no dissent from the rule that such a hospital is a private hospital, and may, at least in the absence of control by the legislature, conduct its business largely as it sees fit.

The question of public or private status has frequently arisen in suits by a physician to compel the hospital to admit him to the use of its facilities. See annotation at 24 *A. L. R.* 2d 850, 854. The cases uniformly hold that the receipt of public funds and the exemption from taxation do not convert a private hospital into a public one. See the following cases: *Levin v. Sinai Hospital,* 186 *Md.* 174, 46 *A.* 2d 298 (supported in part by public funds); *Van Campen v. Olean General Hospital,* 210 *App. Div.* 204, 205 *N. Y. S.* 554, affirmed 239 *N. Y.*

615, 147 *N. E.* 219 (although exempted from taxation); *West Coast Hospital v. Hoare, Fla.*, 64 *So.* 2d 293 (grants of public funds); *Edson v. Griffin Hospital*, 21 *Conn. Sup.* 55, 144 *A.* 2d 341 (a private hospital is one founded and maintained by private persons and the granting of state and municipal aid does not make it a public hospital).

The rule has even been applied to a county-owned hospital if leased to and operated by a private corporation. *Akopiantz v. Board of County Commissioners*, 65 *N. Mex.* 125, 333 *P.* 2d 611.

Moreover, the holding that the receipt of grants of public money requires the hospital to care for emergency cases, as distinguished from others, is not logical. Why emergency cases? If the holding is sound it must apply to all the hospital services, and that conclusion, as we shall see, is clearly unsound.

Plaintiff attempts to build an argument upon 9 *Del. C.* 1806, requiring the Levy Court of New Castle County to appropriate $10,000 to the defendant hospital for medical care for indigent persons suffering from contagious diseases. Subsection (b) provides that the hospital "shall admit and care for" such persons.

Plaintiff argues that this is a recognition of the status of the defendant as a public hospital. On the contrary, it is no more than a condition attached to the gift; or at most a regulation of certain special cases of disease affecting public health. There is no doubt that medical care is directly related to public health and is therefore an appropriate subject of legislative regulation; but the provision in subsection (b) only emphasizes the absence of any other provision requiring the hospital to admit any one.

We are of opinion that the defendant is a private and not a public hospital, in so far as concerns the right of a member of the public to demand admission or treatment.

What, then, is the liability of a private hospital in this respect?

 Since such an institution as the defendant is privately owned and operated, it would follow logically that its trustees or governing board alone have the right to determine who shall be admitted to it as patients. No other rule would be sensible or workable. Such authority as we have found supports this rule.

"A private hospital owes the public no duty to accept any patient not desired by it, and it is not necessary to assign any reason for its refusal to accept a patient for hospital service." 41 *C. J. S.* Hospitals § 8, p. 345.

To the same effect is 26 *Am. Jur.* "Hospitals and Asylums", p. 593.

In *Birmingham Baptist Hospital v. Crews*, 229 *Ala.* 398, 157 *So.* 224, 225, it appeared that after giving a child emergency treatment for diptheria the hospital refused her admission because its regulations did not permit the admission of patients with contagious diseases. The court said:

"Defendant is a private corporation, and [is] not a public institution, and owes the public no duty to accept any patient not desired by it."

The Supreme Judicial Court of Massachusetts, in *McDonald v. Massachusetts General Hospital*, 120 *Mass.* 432, 21 *Am. Rep.* 529, 532, discussing the question of the character of a hospital as a public charity, announced the same rule:

"Nor does the fact that the trustees, through their agents, are themselves to determine who are to be the immediate objects of the charity, and that no person has individually a right to demand admission to its benefits, alter its character. All cannot participate in its benefits; the trustees are those to whom is confided the duty of selecting those who

shall enjoy them, and prescribing the terms upon which they shall do so. If this trust is abused, the trustees are under the superintending power of this court of equity, by virtue of its authority to correct all such abuse, and the interest of the public therein, that is to say, of the indefinite objects of the charity, may be represented by the Attorney-General."

In *Levin v. Sinai Hospital,* above cited the court said:

"A private hopital is not under a common law duty to serve every one who applies for treatment or permission to serve." 46 *A.* 2d 301.

*Van Campen v. Olean General Hospital,* also cited above, is to the same effect.

The above authorities announce a general rule governing the question of admissions to a private hospital. Does that rule apply to the fullest extent to patients applying for treatment at an emergency ward?

Defendant stresses the rule or practice of the hospital to decline to give medical aid to persons already under the care of a physician. This is no doubt entirely reasonable, but we do not think the rule controlling in this case. We are not furnished with a copy of the rule, or with an affidavit explaining it, but it would seem to be applicable to all admissions—not especially to admissions to the emergency ward. Its significance here appears to lie in the fact that it impliedly recognizes that in case of "frank"—*i.e.* unmistakable—emergency there is some duty on the part of the hospital to give help.

We return, then to the important question: Is there any duty on the part of the hospital to give treatment in an emergency case, *i.e.,* one obviously demanding immediate attention?

It may be conceded that a private hospital is under no legal obligation to the public to maintain an emergency

ward, or, for that matter, a public clinic. *Cf. Taylor v. Baldwin, Mo.*, 247 *S. W.* 2d 741, 751.

But the maintenance of such a ward to render first-aid to injured persons has become a well-established adjunct to the main business of a hospital. If a person, seriously hurt, applies for such aid at an emergency ward, relying on the established custom to render it, is it still the right of the hospital to turn him away without any reason? In such a case, it seems to us, such a refusal might well result in worsening the condition of the injured person, because of the time lost in a useless attempt to obtain medical aid.

Such a set of circumstances is analogous to the case of the negligent termination of gratuitous services, which creates a tort liability. *Restatement, Law of Torts,* "Negligence", § 323.

It must be admitted that there is a dearth of helpful legal precedent. There are very few cases dealing with the liability of a hospital for neigligence in connection with the care and treatment of a patient brought to an emergency ward. See annotation at 72 *A. L. R.* 2d 396. Nearly all the decisions that have been found deal with charges of negligence in the treatment of a patient who has been accepted for treatment. See *Bourgeois v. Dade County, Fla.*, 99 *So.* 2d 575, 72 *A. L. R.* 2d 391 (interne charged with negligent examination of patient); *Leavy v. Yates, Sup.*, 142 *N. Y. S.* 2d 874 (doctor charged with negligent diagnosis of injured patient); *Wade v. Ravenswood Hospital Association*, 3 *Ill. App.* 2d 102, 120 *N.E.* 2d 345 (charge of lack of competent medical care).

But this is not a case in which the hospital assumed to treat the patient. The claim is that it should have treated him, and that the nurse was negligent in failing to have the infant examined by the interne on duty, because an apparent emergency existed.

This leads to the inquiry: What is the duty of a nurse to one applying for admission as an emergency case? Obviously, if an emergency is claimed, some one on behalf of the hospital must make a *prima facie* decision whether it exists. The hospital cannot reasonably be expected to station an interne at all times in the receiving room. It therefore keeps a nurse on duty. If the nurse makes an honest decision that there is no unmistakable indication of an emergency, and that decision is not clearly unreasonable in the light of the nurse's training, how can there be any liability on the part of the hospital?

The only case cited to us involving refusal of treatment at an emergency ward is that of *O'Neill v. Montefiore Hospital*, 11 *A. D.* 2d 132, 202 *N. Y. S.* 2d 436. In that case Mr. and Mrs. John J. O'Neill came early one morning to the hospital emergency ward. O'Neill complained of symptoms of a heart ailment or attack. He was refused admission because he was a member of a Hospital Insurance Plan and the hospital did not take such cases. The nurse called an H I P doctor, and Mr. O'Neill took the telephone and described his symptoms. The nurse then arranged for O'Neill to see that doctor a few hours later. Mrs. O'Neill asked to have a doctor examine him because it was an emergency, but this was not done. The O'Neils returned home, and O'Neill died in a very short time.

In a suit against the doctor and the hospital the trial court found for the defendants. The Appellate Division unanimously reversed as to the doctor. As to the hospital, three judges held there was a question of fact for the jury to decide, that is, whether the nurse's conduct was a personal favor to deceased, or whether her conduct was that of an attaché discharging her duty, and if the latter, whether what she did was adequate. Two judges dissented, pointing out that the doctor called by the nurse did not, after talking to the patient, indicate that any emergency treatment was required, or re-

quest that the patient be admitted to the hospital. In these circumstances they found no liability.

The difference of opinion in that case seems to turn on the question whether, by calling a physician for the applicant, the nurse assumed to give him hospital service. The case does not discuss the questions of what constitutes an emergency, and what is the duty of the nurse in such cases.

As to the majority holding that the nurse's telephone call gave rise to liability, we respectfully dissent. We think the minority opinion is the better view.

As above indicated, we are of opinion that liability on the part of a hospital may be predicated on the refusal of service to a patient in case of an unmistakable emergency. The hospital rule with respect to applicants already under the care of a physician may be said to be an implied recognition of this duty.

Applying this rule here, we inquire, was there an unmistakable emergency? Certainly the record does not support the view that the infant's condition was so desperate that a layman could reasonably say that he was in immediate danger. The learned judge indicated that the fact that death followed in a few hours showed an emergency; but with this we cannot agree. It is hindsight. And it is to be noted that the attending physician, after prescribing for the child on morning before, did not think another examination that night or the next morning was required. If this case had gone to the jury on the record here made, we would have been required to hold that it was insufficient to establish liability. We cannot agree that the mere recitation of the infant's symptoms was, in itself, evidence of an emergency sufficient to present a question for the jury. Before such an issue could arise there would have to be evidence that an experienced nurse should have known that such symptoms constituted unmistakable evidence of an emergency.

We must keep in mind the fact that this is not the ordinary accident case in which the services of the hospital emergency ward are sought because of a showing of serious physical injury, or of a danger of such injury. It is a case of disease. This is not to say that an emergency could not arise out of a diseased condition; it is only to say that some degree of experience and knowledge is required to make a *prima facie* determination of the existence of such an emergency.

We do not think that the record made below satisfactorily developed the pertinent facts. What is standard hospital practice when an applicant for aid seeks medical aid for sickness at the emergency ward? Is it the practice for the nurse to determine whether or not an emergency exists, or is it her duty to call the interne in every case? Assuming (as seems probable) that it is her duty to make such a determination, was her determination in this case within the reasonable limits of judgment of a graduate nurse, even though mistaken, or was she derelict in her duty, as a graduate nurse, in not recognizing an emergency from the symptoms related to her? To resolve these questions additional evidence, probably expert opinion, would seem to be required.

It may be said that it was the duty of the plaintiff below, when confronted with the motion for summary judgment, to offer additional proof by affidavit or otherwise. This is perhaps so, but the defendant also could have submitted evidence on the questions we have referred to. At it was, the defendant pitched its case on the theory that under no circumstances could it be liable. The possibility that the case might turn on additional evidence respecting the matters we have touched upon was not considered either by the court or counsel.

In the circumstances we think the case should go back for further proceedings. We should add, however, that if plaintiff cannot adduce evidence showing some incompetency of the nurse, or some breach of duty or some negligence, his case

must fail. Like the learned judge below, we sympathize with the parents in their loss of a child; but this natural feeling does not permit us to find liability in the absence of satisfactory evidence.

For the reasons above set forth the order denying summary judgment is affirmed, without approving the reasons therefor set forth in the court's opinion.