Fabian, et ux., Appellants, *v.* Matzko, et al.

Argued March 21, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Robert M. Ross,* with him *Galen D. Hawk,* and *Richter, Syken, Ross & Levant,* for appellants.

*F. Porter Wagner* and *Gailey C. Keller,* with them *James K. Thomas,* and *Marks and Wagner,* and *Smith, Eves and Keller,* for appellees.

OPINION BY PRICE, J., September 22, 1975:

This appeal stems from the lower court's order granting a motion for summary judgment in favor of the defendants-appellees, Dr. Thomas Cahill and The Geisinger Medical Center, a private hospital located in Danville, Pennsylvania. Viewing the facts in the light most favorable to the appellant, as we must for purposes of

this appeal, *Gast v. Petsinger*, 228 Pa. Superior Ct. 394, 323 A.2d 371 (1974), the record establishes the following: On or about April 22, 1965, the plaintiff-appellant, Helen Fabian, developed an intense and sudden headache, stiffness in her neck, and nausea. Her husband, plaintiff-appellant Jan Fabian, telephoned Dr. Michael Matzko,[1] who examined Mrs. Fabian and diagnosed her condition as a viral infection. Later that day, when the medications prescribed by Dr. Matzko produced no observable improvement in Mrs. Fabian's condition, Mr. Fabian called the Geisinger Medical Center. The operator at the hospital connected Mr. Fabian with a man who identified himself as Dr. Cahill. Mr. Fabian told Dr. Cahill that his wife had developed a "sudden, severe headache, that she was vomiting and complaining about a stiffness in the back of her neck and there was soreness in her leg." (NT 24a) Mr. Fabian told Dr. Cahill that he wanted Mrs. Fabian admitted to the hospital for a check-up. In accordance with the hospital's standard procedure, Dr. Cahill asked Mr. Fabian whether he had a family doctor and what his diagnosis had been. Dr. Cahill told Mr. Fabian that Mrs. Fabian could not be admitted unless the arrangements for admission were made by Dr. Matzko. Mr. Fabian attempted to contact Dr. Matzko, but was unable to do so. He then tried to re-contact Dr. Cahill, but was told that Dr. Cahill had left the Medical Center for the day.

Mrs. Fabian's condition seemed to improve over the next few days, but on May 3, 1965, she suffered another attack and was admitted to the Geisinger Medical Center, through arrangements made at that time by Dr. Matzko. She had sustained a cerebral hemorrhage with permanent brain damage, loss of speech, partial paralysis, loss of

---

1. Dr. Matzko, a co-defendant below, is not a party to this appeal.

hearing, loss of vision and expressive and receptive aphasia.

Appellants filed this trespass action alleging that Mrs. Fabian's injuries were caused by the negligence of the appellees in failing to admit Mrs. Fabian for treatment and in failing to render proper medical assistance to her.

The appellants base their contention on Restatement (Second) of Torts, §323 (1965): "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking."

As phrased by the appellant, the issue under §323 is whether a jury can conclude that the Geisinger Medical Center through its agent, Dr. Thomas Cahill, undertook either gratuitously or for a consideration, to render medical service to the appellant. Even under the broadest view of what constitutes medical service, Dr. Cahill never rendered those services to the appellant in this case. The sole contact between appellant and Dr. Cahill was a telephone call in which Dr. Cahill informed the appellant of the hospital's policies.

In *Hamil v. Bashline,* 224 Pa. Superior Ct. 407, 307 A.2d 57 (1973), the physician-patient relationship began by a telephone call. But in that case, the plaintiff was told to bring her decedent to the hospital. At the hospital, the doctor on duty ordered an EKG and an unsuccessful attempt was made to take an EKG. Thus the substance of the relationship in *Hamil* was significantly greater than in the case presently before us. Clearly, liability under §323 can be imposed only upon "[o]ne who under-

takes . . . to render service to another. . . ." Unlike *Hamil,* no such undertaking occurred in this case, and no physician-patient relationship ever arose.

Appellant's second theory of liability is based upon a growing line of cases which has recognized the duty of a hospital with an emergency facility to admit patients in need of emergency care. Although never considered by a Pennsylvania appellate court, the general rule in other jurisdictions is that a private hospital is under no duty to accept patients that it considers undesirable and it may reject or accept patients for admission as it sees fit. *See Am. Jur. 2d, Hospitals and Asylums* §12; *Le Juene Road Hospital, Inc. v. Watson,* 171 So. 2d 202 (Fla. App. 1965). Some jurisdictions have recognized an exception to this rule where a hospital with an emergency facility refuses to treat an applicant in an emergency situation.

In *Wilmington General Hospital v. Manlove,* 54 Del. 15, 174 A.2d 135 (1961), Darien Manlove, an infant, developed a fever and diarrhea. Darien's family doctor prescribed medication, which was applied, but to no avail. Darien's parents took her to the emergency ward of the defendant hospital. The nurse on duty told the parents that Darien could not be treated at the hospital "because the child was under the care of a physician and there would be danger that the medication of the hospital might conflict with that of the attending physician." 54 Del. at 17, 174 A.2d at 136. Darien died shortly thereafter.

In the wrongful death action brought by Darien's parents against the hospital, the Supreme Court of Delaware affirmed the lower court's refusal to grant the dedendant's motion for summary judgment. The court recognized the general rule that a hospital may refuse to accept patients for any reason, and also recognized that a hospital is under no duty to maintain an emergency facility. However, the court held that "liability on the part of a hospital may be predicated on the refusal of service to a patient in case of an unmistakable emergency

[if the patient has relied upon a well-established custom of the hospital to render aid in such a case]." 54 Del. at 25, 174 A.2d at 140 (bracketed portion omitted in official report). The court was concerned with the fact that a person in need of immediate medical care uses valuable time when he goes to an emergency facility. A rejection at the emergency facility may mean that the injured person's condition will deteriorate because he relied on the hospital's policy of rendering emergency care.

In *Stanturf v. Sipes,* 447 S.W.2d 558 (Mo. 1969), a case similar to the one presently before us, the plaintiff had been stranded in his car overnight in zero-degree weather. A passing school bus conveyed him to his daughter's house, where he was examined by a Dr. Duffy. Dr. Duffy concluded that the plaintiff's feet were frostbitten and that he had to be treated in a hospital.

While the plaintiff remained at his daughter's, Dr. Duffy sought to have him admitted to the only hospital in the area, Wright Memorial Hospital. The hospital refused to admit the plaintiff until he paid a $25 admission fee. Although the plaintiff did not have $25, several people and organizations volunteered to pay the $25 fee for him. Despite the offer, admission was still refused.

Thereafter, plaintiff sought to be admitted at other, more distant hospitals, and after several unsuccessful attempts, he was admitted to the Kansas Medical Center, where it became necessary to amputate both of his feet. In the plaintiff's action against Wright Memorial Hospital and that hospital's administrator, the Supreme Court of Missouri reversed the lower court's grant of a motion for summary judgment in favor of the defendants, basing its decision on *Manlove, supra,* and on the fact that the hospital had departed from its usual policy of admitting any patient who paid the $25 fee.

The rationales leading to the decisions in *Manlove* and *Stanturf* are inapposite here. In the present case, appel-

lant did not rely on a policy of rendering emergency care. Appellant did not go to the hospital, and thus did not waste valuable time. Furthermore, this was not an unmistakable emergency. In fact, there were no facts which would have indicated to Dr. Cahill that this was an emergency situation. Mr. Fabian, a layman, told Dr. Cahill that Dr. Matzko had diagnosed Mrs. Fabian's condition as a viral infection. Dr. Cahill had no reason to suspect that Dr. Matzko's diagnosis was incorrect. Finally, the hospital in this case did not depart from one of its standard procedures, as did the hospital in *Stanturf*. Dr. Cahill's deposition reveals that any prospective patient under the care of an outside physician could only be admitted if the arrangements were made by that physician.

As stated above, a private hospital is presently under no duty to accept non-emergency patients that it does not desire. This case does not come within the emergency exception, there is no genuine issue as to any material fact, and the appellee is entitled to a judgment as a matter of law. Pa. R. C. P. 1035 (b).

The order of the lower court is affirmed.

————

CONCURRING OPINION BY SPAETH, J.:

As I understand the majority opinion, it concludes that there is no need to decide what should be the Pennsylvania rule on a private hospital's responsibility to admit an emergency case, because "this was not an unmistakable emergency" (majority opinion at 273). On whether there was an emergency, I agree with Judge JACOBS's dissent: that is a question of fact that we are not able on this record to resolve. Even with this agreement, however, I concur in the result reached by the majority.

I believe Pennsylvania should join the growing number, albeit still a minority, of jurisdictions, *see* 35

A.L.R. 3d 841, §4, that have adopted the rule that "a private hospital is under no legal obligation to the public to maintain an emergency ward. But if the hospital maintains such a ward, and if there is a well-established custom of the hospital to render aid in case of an unmistakable emergency, refusal of service to an emergency patient who relies on that custom may give rise to liability on the part of the hospital, depending on the facts of the case." 40 Am. Jur. 2d 862, §16. *See also, Wilmington General Hospital v. Manlove,* 4 Storey 15, 54 Del. 15, 174 A.2d 135 (1961).[1] If this rule is applied to the present case, it will be seen that the motion for summary judgment was properly granted, for assuming there was an emergency, still, there is no evidence of a "well-established custom" on the part of Geisinger Medical Center to render aid in an emergency.

In the complaint appellants allege that Geisinger "held itself out to the public as being open for the reception of patients in need of emergency and other medical services." This does not seem to me to plead a well-established custom, and I am encouraged in this conclusion by the fact that in pleading Geisinger's acts of negligence, the only reference in the complaint to custom is that Geisinger "fail[ed] to conform to the standards and customs of *other* hospitals in the community." (emphasis added).

The only testimony on what Geisinger's practice was appears in Dr. Cahill's deposition. He said that to be admitted to Geisinger, "[t]he patient had to be seen by

---

1. This rule significantly modifies the general rule that "a private hospital is under no obligation to admit any patient that it does not desire." *LeJuene Road Hospital, Inc. v. Watson,* 171 So. 2d 202, 203 (Fla. 1965). It is even more significantly different from the formulation referred to by Judge JACOBS (that "[a] hospital which maintains an emergency room is under a duty to recognize and respond to a genuine medical emergency"), for which I have found no authority.

a physician on the permanent staff of Geisinger." He was then asked by appellants' counsel about "an emergency patient," and replied:

"A. They would have their attending physician from the outside call the appropriate department giving the details of such emergency, and then the physician could take the matter from there.

Q. You mean the physician at the Center itself?

A. That's right.

Q. In the event a patient did not have an attending physician, was there any procedure for the admission of such a patient at the hospital?

A. The patient could be seen in the emergency room of the hospital.

Q. And if circumstances warranted, a patient could then be admitted?

A. Yes."

Later in the deposition, appellants' counsel asked, "I am talking about a patient who has been under the care of an attending physician for the very condition that he or she seeks to be admitted for?", and the doctor replied:

"In a situation where a patient calls in under the care of a physician and urgently seeks admission where we are dealing with a problem of having a patient seen by a physician at a given time, we need a physician from the outside call and give us more details about the case."

The reason for the well-established custom rule is that if there is such a custom, and someone relies on it by taking a person who is suffering a medical emergency to the hospital, the hospital's refusal to render aid "might well result in worsening the condition of the injured person, because of the time lost in a useless attempt to obtain medical aid." *Wilmington General Hospital v. Manlove, supra,* at 23. This element of delay is missing in the present case.

Even if one were to assume that the bare allegation of appellants' complaint, that Geisinger "held itself out to the public as being open for the reception of patients in need of emergency . . . services," was sufficient to create a genuine issue as to a material fact, still the motion for summary judgment was properly granted. Appellant husband did not do the obvious thing in an emergency: he did not take his wife to the hospital. I do not suggest he was at fault; he was, evidently, quite naturally relying on the advice of his family physician. The point is, however, that he did not establish a sufficient relationship with Dr. Cahill, and through the doctor, Geisinger, to support a cause of action. To do that, appellants had to show an "undertaking":

> "One who undertakes, gratuitously and for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement, Second, Torts, §323.

I can find no case in which a telephone call such as the one here was held to be an undertaking. Indeed, the inadequacy of that call is demonstrated by *Hamil v. Bashline*, 224 Pa. Superior Ct. 407, 307 A.2d 57 (1973), on which appellants so heavily rely. There the plaintiff telephoned the hospital and told the night supervisor that her husband was suffering severe chest pains. However, it was not that call that established an undertaking, but what ensued. The plaintiff was told by the supervisor to bring her husband to the hospital. When she did, the doctor assigned to emergency duty was not there, and could not be found, and the doctor who was there did

nothing except order an EKG, but the EKG machine did not work because it was plugged into a defective outlet. In consequence, the plaintiff's husband was taken to another doctor's office, where he died. This series of events not only illustrates when an undertaking arises; it also represents the sort of "time lost in a useless attempt to obtain medical aid," referred to by the well-established custom rule.

I therefore agree that the motion for summary judgment was properly granted.

———

DISSENTING OPINION BY JACOBS, J.:

I must dissent.

A summary judgment is to be entered only in the clearest of cases where there is not the slightest doubt as to the absence of a genuine issue of material fact. *Granthum v. Textile Machine Works,* 230 Pa. Superior Ct. 199, 326 A.2d 449 (1974) ; *Prince v. Pavoni,* 225 Pa. Superior Ct. 286, 302 A.2d 452 (1973). The court in determining whether an issue of material fact exists must "accept as true all well pleaded facts in the non-moving parties' pleadings, as well as the admissions on file, giving to them the benefit of all reasonable inferences to be drawn therefrom; the record must be examined in the light most favorable to them; and in passing upon a motion for summary judgment, it is no part of [the court's] function to decide issues of fact but solely to determine whether there is an issue of fact to be tried . . ." *Ritmanich v. Jonnel Enterprises, Inc.,* 219 Pa. Superior Ct. 198, 203, 280 A.2d 570, 573 (1971). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Schacter v. Albert,* 212 Pa. Superior Ct. 58, 239 A.2d 841 (1968).

Keeping these principles in mind, I believe that the lower court acted prematurely in granting summary judgment and that this Court acts unwisely in sustaining that action.

The appellants have attempted to base their medical malpractice claim upon two theories of liability, one well established, the other as yet without precedent in this Commonwealth. As I read the record material issues of fact exist relevant to each liability theory. The first theory, based upon Restatement (Second) of Torts, §323 (1965) quoted in the majority opinion, *ante* at 270, suggests that Dr. Cahill undertook either gratuitously or for consideration to render medical services to the plaintiff-appellant, Mrs. Fabian. The majority, distinguishing *Hamil v. Bashline,* 224 Pa. Superior Ct. 407, 307 A.2d 57 (1973) which adopted Restatement §323, states that "no such undertaking occurred in this case, and no physician-patient relationship ever arose." *Ante* at 271. Although I am far from convinced to the contrary, I cannot conclude "beyond the slightest doubt" that Dr. Cahill did not undertake to render medical services.

The appellant, Mr. Fabian, related the details of his conversation with Dr. Cahill in a deposition. He stated:

"[Dr. Cahill] identified himself on the telephone, and he asked me what my problem was, and I told him the symptoms, that my wife had a sudden, severe headache, that she was vomiting and complaining about a stiffness in the back of her neck and there was a soreness in her leg. I noticed when she walked that she was just dragging that leg . . .I told Dr. Cahill that she had this sudden severe headache and the symptoms I just mentioned. He asked me if I had a family doctor, and I said that I did, and he asked me who my family doctor was, and I said 'Dr. Matzko'.
BY MR. ROSS:
Q. And you say this was Dr. Cahill?
A. Yes. He said, 'Well, what did Dr. Matzko say?' I said, 'Well, Dr. Matzko said it was the virus.' Dr. Cahill, he said to me, 'Well, you are not a doctor to make a diagnosis; if your doctor said it is a virus, it is a virus.' " Record at 24a-25a.

Viewed in the light most favorable to the appellant, *Ritmanich v. Jonnel Enterprises, Inc.*, supra,[1] Dr. Cahill did *something* with regard to Mr. Fabian's concerns for his wife's health. If the appellant interpreted Dr. Cahill's statement as a confirming medical diagnosis based upon an evaluation of the recited symptoms, it could have acted to abate his fears and delay further affirmative action on his part. Improperly diagnosing a serious condition requiring immediate care as a slight ailment requiring no immediate attention could be, of course, actionable negligence. *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959). I reiterate that I am not convinced that Dr. Cahill undertook a diagnosis; however, I am not convinced beyond the slightest doubt that he did not. I would hold, therefore, that an issue was raised for the trier of fact and that summary judgment was improper.

The appellant's second theory of liability which they propose be adopted in this Commonwealth can be stated as follows:

> A hospital which maintains an emergency room is under a duty to recognize and respond to a genuine medical emergency.

The appellants assert that the symptoms recited to Dr. Cahill indicated the existence of a medical emergency and that when confronted with such an emergency the appellees failed to respond in a reasonable manner.

The majority in disposing of this contention determines that no medical emergency existed. The majority states that "[t]his case does not come within the emergency exception," *ante* at 273, "this was not an unmistakable emergency. In fact, there were no facts which would have indicated to Dr. Cahill that this was an emergency situation." *Ante* at 273. I must confess that I have neither the training nor the experience to evaluate

---

1. Dr. Cahill stated in deposition that he had no recollection of the phone conversation. Record at 57a-58a.

a given set of symptoms and render a medical judgment as to its meaning. I cannot agree with the majority's presumption that it possesses such wisdom.

Moreover, even if each member of this Court were competent to evaluate the facts as medical experts, we could not do so. Our function is to determine solely whether an issue of fact exists, not to decide that issue of fact. *Ritmanich v. Jonnel Enterprises, Inc.*, supra.

I would reverse the judgment below as prematurely granted.

WATKINS, P.J., joins in this dissenting opinion.