548 So.2d 1384 (1989)
Tammy CHANDLER, et al.
v.
HOSPITAL AUTHORITY OF the CITY OF HUNTSVILLE, Alabama.
No. 87-1236.
Supreme Court of Alabama.
August 25, 1989.
*1385 Robert H. Ford and Daniel F. Aldridge of Brinkley, Ford, Chesnut & Aldridge, Huntsville, for appellant.
W. Stanley Rodgers and Patrick M. Lamar of Lanier, Ford, Shaver & Payne, Huntsville, for appellee.
S. Greg Burge of Heninger, Burge & Vargo, Birmingham, for amicus curiae The Alabama Trial Lawyers Ass'n.
ALMON, Justice.
Tammy Chandler brought an action against the Hospital Authority of the City of Huntsville ("the Hospital Authority"), the operator of the Huntsville Hospital, for the wrongful death of her son, Darren. The trial court entered summary judgment on the ground that Ala.Code 1975, § 22-21-137(2), granted immunity from tort actions to hospital building authorities. Chandler appealed and this Court reversed the summary judgment, holding that § 22-21-137(2) was unconstitutional. Chandler v. Hospital Authority of the City of Huntsville, 500 So.2d 1012 (Ala.1986). The Hospital Authority filed another motion for partial summary judgment, which was granted.
The only issue presented for review is whether Huntsville Hospital had a duty to provide emergency care to Darren even though his mother had no insurance and did not have the $54 emergency room fee.
On August 16, 1983, Chandler carried her 15-day-old son, Darren, to the Ambulatory Care Center ("ACC") in Huntsville for a two-week post-partem checkup. While they were at the ACC, Darren's temperature was taken and Chandler was told that Darren needed to be taken to Huntsville Hospital for emergency care. Chandler carried Darren to Huntsville Hospital as instructed, arriving at approximately 4:00 p.m.
When Chandler arrived at Huntsville Hospital, she was asked if she had either insurance or $54 for the emergency room admission fee. Chandler replied that she had neither. The admitting clerk told Chandler that Darren could not be seen without insurance or the $54 fee. Shortly thereafter, a nurse told Chandler to take Darren home and to give him Tylenol and a warm bath.
At approximately 8:00 p.m. that evening, Chandler returned to Huntsville Hospital with Darren. At approximately 11:00 p.m. Darren was seen by a doctor. He was admitted into Huntsville Hospital at that time. At approximately 4:30 p.m. the next day, he died from spinal meningitis.
*1386 This action was commenced prior to June 11, 1987, and therefore is governed by the "scintilla rule."[1]
"It is well settled that summary judgment should only be granted when, after viewing the evidence in a light most favorable to the non-moving party, it appears that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law. Rule 56, A.R.Civ.P. A scintilla of evidence supporting the non-movant's position is all that is required to overcome a motion for summary judgment. Ward v. Rhodes, Hammond & Beck, Inc., 511 So.2d 159 (Ala.1987)."
Gunnels v. Glenn Machine Works, Inc., 547 So.2d 448 (Ala.1989); citing Car Center, Inc. v. Home Indemnity Co., 519 So.2d 1319, 1322 (Ala.1988).
In opposition to the Hospital Authority's motion for partial summary judgment, Chandler submitted a document entitled "Huntsville Hospital's Revised Admission Policies" dated August 10, 1983. The following policies were included within the document:
"POLICY ON ADMISSION AND TREATMENT IN THE EMERGENCY/OUTPATIENT DEPARTMENT OF NON-SPONSORED PATIENTS

". . . .
"Madison County:
"At the time a Madison County resident is scheduled to be admitted to Huntsville Hospital or arrives in the Huntsville Hospital Emergency Room and is uninsured, does not have the ability to pay for hospital services, or it is determined to be a non-emergency, patients will be denied treatment at Huntsville Hospital.
"When the patient arrives in an emergency condition, the patient will be admitted.
"DEFINITIONS
"EmergencyA person, in the opinion of the attending physician and hospital personnel, in need of immediate hospitalization or emergency treatment to save life or prevent loss of limb.
"Non-sponsoredPatients who are uninsured and unable to pay the advanced admission fee at time of admission; or do not pay their portions of charges after third party coverage has been collected and collection efforts exhausted.
". . . .
"ADMISSION OF NON-SPONSORED PATIENTS THROUGH THE EMERGENCY ROOM

". . . .
"II. Madison County
"A. Patients who arrive in the Emergency Room and are non-emergent will be denied treatment at Huntsville Hospital.
"B. Patients who arrive in the Emergency Room and are of emergency nature must be admitted. After admission is completed, however, Financial Counselor must be contacted and admission approved.
". . . .
"PROCEDURE FOR TREATMENT OF NON-SPONSORED PATIENTS IN EMERGENCY ROOM

"Non-sponsored patients are defined as those patients from Huntsville/Madison County who present themselves to Huntsville Hospital Emergency Department who are uninsured and unable to pay advanced admission deposits.
"1. The triage nurse performs rapid verbal visual assessment and determines that patient can go through the normal registration process.
"2. The registration clerk ascertains during registration that patient is either uninsured and responsible for his/her account (self pay), will ask for a $54.00 deposit before treatment is initiated.
"3. When deposit is received by clerk, treatment will proceed as normal. Patient cannot pay the deposit ... the CAS will be asked to assess the patient.
"4. If the presenting condition is determined to be a true emergency by the CAS, the patient will be taken to the treatment area and cared for as normal. Any condition, however, that is determined *1387 to be non-emergent, the patient will be refused treatment. Referral will be made to the North Huntsville Community Health Clinic or the phone number of the Madison County Medical Society will be given to the patient for him/her to find a private physician for health care.
"5. The CAS will document information and referrals given in the patient's medical records."
One who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care. Berkel & Co. Contractors, Inc. v. Providence Hospital, 454 So.2d 496 (Ala.1984); Herston v. Whitesell, 374 So.2d 267 (Ala.1979). "[T]he existence of a voluntarily assumed duty through affirmative conduct is a matter for determination in light of all the facts and circumstances." Parker v. Thyssen Mining Construction, Inc., 428 So.2d 615 (Ala.1983).
The above-quoted admissions policies present at least a scintilla of evidence from which a jury could reasonably determine that Huntsville Hospital had assumed a duty to provide emergency care to indigent patients in emergency situations. We hold, therefore, that the trial court erred in granting the Hospital Authority's motion for partial summary judgment. The judgment of the trial court is reversed and the cause is remanded.
REVERSED AND REMANDED.
SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
HORNSBY, C.J., and MADDOX, JONES and KENNEDY, JJ., concur in the result.
MADDOX, Justice (concurring in the result).
On original deliverance, I dissented in part because I was of the opinion that the Hospital was immune from suit. Chandler v. Hospital Auth. of the City of Huntsville, 500 So.2d 1012, 1019 (Ala.1986) (Maddox, J., concurring in part, dissenting in part). While I am still of that opinion, the law of the case is that immunity does not apply. See my opinion concurring specially in Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1256-57 (Ala.1986) (Maddox, J., concurring specially), in which I stated:
"[P]laintiff was given the right, at that time, by a majority of this Court, to try the case again before another jury. Because that judgment was final, and plaintiff obtained the right to try the case again, I am of the opinion that the plaintiff legally obtained the right to obtain a judgment against Black Belt in another proceeding. Consequently, it is my opinion that plaintiff, having obtained a right to a new trial, is entitled to a review of the new trial without regard to my dissenting views on the first appeal, and that the judgment in this new trial must be based upon the principles of law as they exist today."
If there is no immunity, as the majority held on original deliverance, then I concur with the result reached by the majority.
KENNEDY, Justice (concurring in the result).
The majority holds that the duty of the Hospital to provide emergency care to the plaintiff's decedent arose only through the Hospital's voluntary assumption of a duty to provide emergency care to indigent citizens through its own admissions policies. I am of the opinion that, as a matter of public policy and law, such a duty exists without regard to voluntary assumption.
The United States Congress has expressed its dissatisfaction with the common law "no-duty rule" in circumstances such as those presented by this case, as seen in the anti-dumping provisions of the Comprehensive Omnibus Budget Reconciliation Act of 1986 (COBRA), codified at 42 U.S.C. § 1395dd et seq. (Supp. IV 1986). These provisions require a hospital, public or private, participating in the Medicare program and having an emergency department, to provide an appropriate examination within the department's capability to any individual who requests treatment, to determine whether an "emergency medical condition exists." If the hospital determines that the *1388 individual has an emergency medical condition or is in active labor, the hospital must provide either: a) such treatment as is required to stabilize the medical condition or to treat the active labor; or b) a transfer of the individual to another medical facility in accordance with the Act. The Act allows a hospital to transfer a patient without restriction once the patient is stabilized; however, if the patient has not been stabilized or is in active labor, the hospital may not transfer the patient unless: 1) the patient requests a transfer or a qualified medical person certifies that the patient is being transferred for medical reasons; and 2) the transfer is an appropriate transfer within the meaning of the Act. An appropriate transfer is one in which: 1) the receiving facility has available space and qualified personnel and has agreed to accept transfer of the patient and to provide appropriate treatment; 2) the transferring hospital provides the receiving facility with appropriate medical records of the examination and treatment given to the patient by the transferring hospital; 3) the transfer is effected through qualified personnel and equipment; and 4) the transfer meets such other requirements as may be found necessary to ensure the patient's health and safety.
Under the Act, a hospital is relieved of its duty to provide treatment if the individual refuses to consent to treatment or refuses to consent to a proper transfer. Otherwise, if a hospital knowingly, willfully, or negligently fails to comply with the requirements of the Act, the hospital is subject to a bar or to suspension from all Medicare participation, as well as a penalty of not more than $50,000 for each violation. In addition, patients may recover civil damages from the hospital for personal injury caused by a violation of the Act, in accordance with the law of the state in which the hospital is located. Further, while the Act is silent on the matter of punitive damages, it is likely that punitive damages would be recoverable in appropriate circumstances. See A. McClurg, Your Money or Your Life: Interpreting the Federal Act Against Patient Dumping, 24 Wake Forest L.Rev. 173, 219 (1989). Interestingly, statistics compiled by the Health Care Financing Administration show that 98% of the hospitals in this country participate in the Medicare program. See Health Care Financing Admin., Bureau of Management & Strategy, HCFA Statistics 13 (1986); and A. McClurg, 24 Wake Forest L.Rev. at 199 n. 112. (Huntsville Hospital is among the 98% that participate in the Medicare program.) As noted by Professor McClurg in his article, the penalty of a bar or suspension from Medicare participation for refusal to render emergency medical treatment to indigents, would, alone, close the doors of most hospitals in this country. See A. McClurg, 24 Wake Forest L.Rev. at 200.
Recently, a Department of Health and Human Services administrative law judge (A.L.J.) fined a Texas physician $20,000 for transferring an indigent patient who was in active labor to another hospital without treating her. In re: The Inspector General v. Burditt, H.H.S. Admin.Ruling No. C-42 (July 28, 1989). The physician refused to deliver the woman's baby for fear that he might later be sued for malpractice. Over the protestations of the nurses on duty, the woman was sent in an unequipped ambulance to a hospital 160 miles away. Not long after the ambulance departed, the woman told the attendants that she was about to deliver the child. The ambulance driver pulled off onto the side of the highway, and a healthy baby boy was born. The ambulance then took the woman to another hospital to obtain some medication to control post-partum bleeding. She then requested that she be taken back to the hospital where she had first gone. The physician who had refused to deliver her baby on the first visit again refused to see her, and another physician consented to treat her.
The A.L.J., in his order, determined the following: (1) that the physician acted in "reckless disregard" in his failure to treat the woman; (2) that the physician's transfer of the woman to another hospital posed a "threat to the health and safety of the woman and her child"; and (3) that the condition of the woman posed an "emergency *1389 medical condition" within the meaning of COBRA. Id.
Although the Burditt case does not involve a situation where (as here) the patient was refused treatment because of an inability to pay, the A.L.J. did hold the physician liable under COBRA because it was a case of a "`responsible physician' who knowingly violated requirements of Section 1867." Thus, under COBRA, hospitals that accept Medicare funds and provide emergency care must either treat the emergency patient or transfer the patient to another hospital in accordance with the rules outlined above.
The leading case on a hospital's duty to provide emergency care is Wilmington General Hospital v. Manlove, 54 Del. 15, 174 A.2d 135 (1961). In Manlove, the court stated:
"It may be conceded that a private hospital is under no legal obligation to the public to maintain an emergency ward, or, for that matter a public clinic. Cf. Taylor v. Baldwin, [362] Mo. [1224] 247 S.W.2d 741, 751 [(1952)].
"But the maintenance of such a ward to render first-aid to injured persons has become a well-established adjunct to the main business of a hospital. If a person, seriously hurt, applies for such aid at an emergency ward, relying on the established custom to render it, is it still the right of the hospital to turn him away without any reason? In such a case, it seems to us, such a refusal might well result in worsening the condition of the injured person, because of the time lost in a useless attempt to obtain medical aid.
"Such a set of circumstances is analogous to the case of the negligent termination of gratuitous services, which creates a tort liability. Restatement, Law of Torts, `Negligence', § 323.
". . . .
"As above indicated, we are of opinion that liability on the part of a hospital may be predicated on the refusal of service to a patient in case of an unmistakable emergency, if the patient has relied upon a well-established custom of the hospital to render aid in such a case. The hospital rule with respect to applicants already under the care of a physician may be said to be an implied recognition of this duty."
54 Del. at 22-25, 174 A.2d at 139-40. This holding was cited with approval in Stanturf v. Sipes, 447 S.W.2d 558 (Mo.1969); and Fabian v. Matzko 236 Pa.Super. 267, 344 A.2d 569 (1975).
Mississippi courts have likewise determined that hospitals have an obligation to provide emergency care:
"In an emergency, the victim should be permitted to leave the hospital only after he has been seen, examined and offered reasonable first aid. In undertaking to do so, a hospital must exercise due care. A hospital rendering emergency treatment is obligated to do that which is immediately and reasonably necessary for the preservation of the life, limb, or health of the patient. It should not discharge a patient in a critical condition without furnishing or procuring suitable medical attention."
New Biloxi Hospital, Inc. v. Frazier, 245 Miss. 185, 197, 146 So.2d 882, 887 (1962).
In Mercy Medical Center of Oshkosh, Inc. v. Winnebago County, 58 Wis.2d 260, 206 N.W.2d 198 (1973), the Supreme Court of Wisconsin discussed the trend in the case law toward imposing a duty on hospitals to provide emergency care:
"It is quite true that at common law there existed a distinction in torts between misfeasance and nonfeasance, and a rule became established that no liability would attach to the failure to intervene in an emergency. See Prosser, Law of Torts 334 (3d ed., 1964); Restatement, 2d of Torts, p. 116, sec. 314 (1965). From this, a corollary rule developed that a hospital was under no duty to accept a patient. See, Birmingham Baptist Hospital v. Crews (1934), 229 Ala. 398, 157 So. 224; see also Note, 40 Texas L.Rev. 732 (1962); 14 Stanford L.Rev. 910 (1962). Dissatisfied with such a rule, some courts have carved out exceptions in emergency cases. Thus where the hospital has detained the injured party *1390 for some time before rejecting him and sending him elsewhere, an acceptance of the patient was deemed established. Methodist Hospital v. Ball (1961), 50 Tenn.App. 460, 362 S.W.2d 475; New Biloxi Hospital, Inc. v. Frazier (1962), 245 Miss. 185, 146 So.2d 882. Other courts have pinned liability for rejection on the hospital's giving some aid and releasing an injured party, thus erroneously giving him reason to believe the emergency had passed. See Bourgeois v. Dade County (Fla.1957), 99 So.2d 575; Reeves v. North Broward Hospital District (Fla.App., 1966), 191 So.2d 307. Other courts have more directly found a duty to admit persons in emergency situations. Wilmington General Hospital v. Manlove (Del., 1961), 4 Storey 15, 174 A.2d 135; Le Juene Road Hospital, Inc. v. Watson (Fla.App., 1965), 171 So.2d 202; Stanturf v. Sipes (Mo., 1969), 447 S.W.2d 558, 35 A.L.R.3d 834; Barcia v. Society of New York Hospital (1963), 39 Misc.2d 526, 241 N.Y.S.2d 373. The Georgia court has imposed such a duty only upon public hospitals. Williams v. Hospital Authority of Hall County (1969), 119 Ga.App. 626, 168 S.E.2d 336. Behind this rule is reasoning that if a hospital holds itself out as providing emergency treatment, its refusal to administer aid might result in a worsening of the injured person's condition due to lost time, and such action is akin to liability based on negligent termination of gratuitous services. See Restatement, 2d of Torts, p. 139, sec. 324(b) (1965).
"But the courts holding a hospital liable for failure to give emergency treatment are still in the minority. See Powers, Hospital Emergency Service and the Open Door, 66 Mich.L.Rev. 1455 (1968); 62 Columbia L.Rev. 730 (1962); Annot. (1971), Liability of Hospital for Refusal to Admit or Treat Patients, 35 A.L.R.3d 841. We think, however, that today, with our society's emphasis upon a concern for the health of its citizens, private hospitals with emergency wards and facilities for emergency services have a duty to admit those in need of aid. It would shock the public conscience if a person in need of medical emergency aid would be turned down at the door of a hospital having emergency service because that person could not at that moment assure payment for the service. The public expects such service; the public support of a hospital and the governmental grants in aid to hospitals to increase their facilities all substantiate the fact [sic] that hospitals with emergency service cannot refuse it to the needy. Abolishment of the charitable hospital immunity rule constituted a judicial expression of this desire to obtain responsible medical treatment for all patients. See Kojis v. Doctors Hospital, (1961), 12 Wis.2d 367, 107 N.W.2d 131, 107 N.W.2d 292."
58 Wis.2d at 266-168, 206 N.W.2d at 200-201.
Since Winnebago County was decided, other states' courts have held that hospitals have a duty to render emergency care. In Richard v. Adair Hosp. Found. Corp., 566 S.W.2d 791 (Ky.App.1978), the court held:
"In a non-emergency situation there is no duty on the part of a county hospital to admit or treat a patient in the absence of an order from his physician. Courts, though, have carved from the general no-duty-to-admit rule a view that where a hospital refuses care in an emergency situation, liability may be predicated upon such refusal."
566 S.W.2d at 793. In Valdez v. Lyman-Roberts Hosp., Inc., 638 S.W.2d 111 (Tex.Civ.App.1982), the court said:
"While a private hospital may conduct its business largely as it sees fit, liability on the part of the hospital may be predicated on the refusal of service to a patient in the case of unmistakable emergency if the patient has relied upon the custom of the hospital to render aid in such a case."
638 S.W.2d at 114, n. 1. The Arizona Supreme Court has stated:
"The hospital initially receiving the indigent emergency medical patient is obligated to continue to provide needed emergency care so long as it is medically *1391 indicated. Thompson v. Sun City Community Hospital, Inc., 141 Ariz. 597, 688 P.2d 605 (1984)."
St. Joseph's Hospital & Medical Center v. Maricopa County, 142 Ariz. 94, 97, 688 P.2d 986, 989 (1984).
Of the cases that I have found, the most strongly stated is the Georgia Court of Appeals' case of Williams v. Hospital Authority of Hall County, 119 Ga.App. 626, 168 S.E.2d 336 (1969):
"The maintenance of such emergency facilities by a public hospital to render first aid to injured persons has become a well-established adjunct to the main business of a hospital. Treatment is performed by the hospital staff and the patient is billed by the hospital rather than the physician. To say that a public institution which has assumed this duty and held itself out as giving such aid can arbitrarily refuse to give emergency treatment to a member of the public who presents himself with a `broken arm and in a state of traumatic injury, suffering mental and physical pain visible and obvious to the hospital employees' is repugnant to our entire system of government."
119 Ga.App. at 627, 168 S.E.2d at 337. One commentator expresses his opinion even more strongly than the Georgia court:
"It is shocking that although our country possesses highly sophisticated health care facilities and manpower, those resources are not available to emergency patients. The imposition of a duty on all hospitals that maintain emergency rooms to render emergency care is compatible with the high degree of public responsibility associated with hospitals and is consistent with developments in other areas of hospital law. Before Americans lose confidence in our system of justice, the law must respond by imposing a duty to treat emergency patients. A legal system that permits hospitals to close their doors to emergency victims is barbaric, morally reprehensible, and unworthy of respect."
Fine, Opening the Closed Doors: The Duty of Hospitals to Treat Emergency Patients, 24 Wash.U.J. Urb. & Contemp.L. 123, 148 (1983).
In addition to the jurisdictions previously cited, some states impose a statutory duty upon hospitals to provide emergency care. "LSA-R.S. 40:2113.4 imposes a duty on hospitals licensed in Louisiana to make emergency services available to all persons residing in the territorial area regardless of insurance or economic status." Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986). In addition to Louisiana, nine other states (California,[2] Florida,[3] Illinois,[4] Kentucky,[5] New York,[6] Tennessee,[7] Texas,[8] Wisconsin,[9] and Wyoming[10]) have imposed a statutory duty upon hospitals to provide emergency care to indigents.
If a private hospital holds itself out as a provider to the public of emergency care through the use of an emergency room, the public has a right to assume that the use of the hospital's emergency room is not predicated on a person's ability to pay. To hold otherwise would put indigents on notice that before they seek emergency care for potentially life-threatening injury or illness, they must first determine whether a hospital is public or private. Such a policy would, indeed, be "repugnant to our entire system of government." Williams, supra.
*1392 Regardless of whether a hospital has an admissions policy on indigent emergency room care, a hospital that provides emergency services should be under a duty to provide emergency care to anyone who seeks it and is in need of it. A hospital's first concern, when presented with an emergency situation, should not be the financial status of the person needing care. Rather, its sole concern should be treating the illness or the injury of the person who seeks treatment.
Accordingly, I concur in the result only.
HORNSBY, C.J., and JONES, J., concur.
NOTES
[1] See Ala.Code 1975, § 12-21-12.
[2] Cal.Health & Safety Code § 1317 (Deering 1975).
[3] Fla.Stat.Ann. § 401.45 (West 1973).
[4] Ill.Ann.Stat. ch 111½ § 86 (Smith-Hurd 1977).
[5] Ky.Rev.Stat.Ann. § 216B.400 (Michie/Bobbs-Merrill 1980).
[6] N.Y. Pub.Health Law § 2805-b (McKinney 1977).
[7] Tenn.Code Ann. § 53-5201 (1977).
[8] Tex.Health & Safety Code Ann., § 4438a (Vernon 1976).
[9] Wis.Stat.Ann. § 46.21(8)(b) (West 1979).
[10] Wyo.Stat. § 35-2-115(a) (1977).