[Civ. No. 50094. First Dist., Div. One. Apr. 26, 1982.]

BRENDA MARIE PAYTON, Plaintiff and Appellant, v.
JOHN C. WEAVER, JR., et al., Defendants and Respondents.

**COUNSEL**

Warren B. Wilson, Joanne F. Casey and Wilson & Casey for Plaintiff and Appellant.

Charles Bond, Bond & Schickman, Marrs A. Craddick, Craddick & Candland, Craddick, Candland & Conti, Philip S. Berry, Berry & Berry, William J. Bush, Stephen B. Peck, Robert L. Rusky and Hanson, Bridgett, Marcus, Vlahos & Stromberg for Defendants and Respondents.

Jerome Berg, Victoria Robinson Smith, Kenneth L. Freeman, Robert J. Pristave, Drew P. Kaplan and Ross, Hardies, O'Keefe, Babcock & Parsons as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**GRODIN, J.*—**Occasionally a case will challenge the ability of the law, and society, to cope effectively and sensitively with fundamental problems of human existence. This is such a case. Appellant, Brenda Payton, is a 35-year-old black woman who suffers from a permanent and irreversible loss of kidney function, a condition known as chronic end stage renal disease. To stay alive, she must subject herself two or three times a week to hemodialysis (dialysis), a process in which the patient's circulatory system is connected to a machine through which the blood is passed. Using salts and osmotic membranes, artificial kidneys in the machine drain the blood of excess liquids and accumulated impu-

---

*Assigned by the Chairperson of the Judicial Council.

rities. Without such treatment, the volume of liquids in the patient's system will increase dangerously; liquid will begin to fill the lungs, making breathing difficult and possibly leading to heart failure. The resulting toxic waste buildup and chemical imbalances can also threaten the function of the heart and other organs.

Brenda has other difficulties. Unable to care for her children, she lives alone in a low-income housing project in West Oakland, subsisting on a $356 per month Social Security check. She has no family support; one brother is in prison and another is a mental patient. She confesses that she is a drug addict, having been addicted to heroin and barbiturates for over 15 years. She has alcohol problems, weight problems and, not surprisingly, emotional problems as well.

Despite these difficulties Brenda appears from the record to be a marvelously sympathetic and articulate individual who in her lucid moments possesses a great sense of dignity and is intent upon preserving her independence and her integrity as a human being. At times, however, her behavior is such as to make extremely difficult the provision of medical care which she so desperately requires.

The other principal figure in this case is respondent John C. Weaver, Jr., a physician specializing in kidney problems. He conducts his practice through respondent Biomedical Application of Oakland, Inc. (BMA), which operates an outpatient dialysis treatment unit on the premises of respondent Providence Hospital.

Dr. Weaver began treating Brenda in 1975 when, after the birth of Brenda's twin daughters, her system rejected a transplanted kidney. He has been treating her ever since. To her, "Dr. Weaver is and was and still is the man between me and death . . . other than God, I don't think of nobody higher than I do Dr. Weaver."

On December 12, 1978, Dr. Weaver sent Brenda a letter stating he would no longer permit her to be treated at BMA because of her "persistent uncooperative and antisocial behavior over . . . more than . . . three years . . . her persistent refusal to adhere to reasonable constraints of hemodialysis, the dietary schedules and medical prescriptions . . . the use of barbiturates and other illicit drugs and because all this resulted in disruption of our program at BMA."

In the latter part of 1978, Brenda applied for admission to the regular dialysis treatment programs operated by respondents Alta Bates and Herrick Hospitals, and was refused.

For several months Dr. Weaver continued to provide Brenda with necessary dialysis on an emergency basis, through Providence. On April 23, 1979, he again notified her by letter that he would no longer treat her on an outpatient basis. This letter led to Brenda's filing of a petition for mandate to compel Dr. Weaver, BMA, and Providence to continue to provide her with outpatient dialysis services. That litigation was settled by a stipulated order which called for continued treatment provided Brenda met certain conditions: that she keep all appointments at their scheduled time; that she refrain from use of alcohol and drugs; that she maintain prescribed dietary habits; and that she "in all respects cooperate with those providing her care and abide by her physician's prescribed medical regimen." Later, a sixth stipulation was added: that Brenda would "enter into and participate in good faith in a program of regular psychotherapy and/or counselling."

Dr. Weaver and BMA continued treatment of Brenda as an outpatient pursuant to the stipulation, but on March 3, 1980, Dr. Weaver, contending that Brenda had failed to fulfill any part of the bargain, again notified her that treatment would be terminated. He provided her with a list of dialysis providers in San Francisco and the East Bay, and volunteered to work with her counsel to find alternative care.

Brenda then instituted a second proceeding, again in the form of a petition for writ of mandate, this time naming Herrick and Alta Bates Hospitals as respondents, along with Dr. Weaver, BMA and Providence. As pertinent here, the petition alleges that all respondents have "wrongfully failed and refused and continue to fail and refuse to provide Petitioner with regular hemodialysis treatment and medical supervision as required by her chronic end-stage kidney condition"; and, more specifically, that the refusal by Herrick and Alta Bates to admit her as an outpatient to their dialysis treatment programs violated their obligations under Health and Safety Code section 1317 to provide "emergency" treatment. The petition also contained allegations that Herrick and Alta Bates had discriminated against her on grounds of race and indigency, in violation of the Civil Rights Act of 1968 and the Hill-Burton Act (42 U.S.C. § 291), but the trial court found these allegations to be unsupported, and they are not at issue here.

The trial court, after a lengthy evidentiary hearing, found that Brenda had violated each and every condition which she had accepted as part of the stipulated order providing for continued treatment, and that finding is basically undisputed. There was evidence that Brenda continued, after the stipulated order, to buy barbiturates from pushers on the street at least twice a week; that she failed to restrict her diet, gaining as much as 15 kilograms between dialysis treatments; that she continued to be late and/or miss appointments; that due primarily to missed appointments she had 30 emergencies requiring hospitalization in the 11 months preceding trial; that she would appear for treatment in an intoxicated condition; that she discontinued her program of counseling after a brief period; and, as the trial court found, she displayed in general "gross non-cooperation with her treating physician, BMA of Oakland and Providence Hospital." The trial court found that her behavior in these respects was "knowing and intentional."

Brenda's behavior was found to affect not only Dr. Weaver but the other patients and the treating staff as well. Dialysis treatment is typically provided to several patients at a time, all of them connected to a single dialysis machine. There was evidence that Brenda would frequently appear for treatment late or at unscheduled times in a drugged or alcoholic condition, that she used profane and vulgar language, and that she had on occasion engaged in disruptive behavior, such as bothering other patients, cursing staff members with obscenities, screaming and demanding that the dialysis be turned off and that she be disconnected before her treatment was finished, pulling the dialysis needle from the connecting shunt in her leg causing blood to spew, and exposing her genitals in a lewd manner. The trial court found that during the times she has sought treatment "her conduct has been disruptive, abusive, and unreasonable such as to trespass upon the rights of other patients and to endanger their rights to full and adequate treatment," and that her conduct "has been an imposition on the nursing staff." The court determined that, on balance, the rights and privileges of other patients endangered by Brenda's conduct were superior to the rights or equities which Brenda claimed.

The court also found, contrary to Brenda's contentions, that Dr. Weaver had given sufficient notice to Brenda, and that Dr. Weaver was not responsible for Brenda being refused dialysis by any other respondent. It concluded that Dr. Weaver had "discharged all obligations imposed by the patient-physician relationship" with Brenda.

As to Alta Bates and Herrick Hospitals the court found that they had not refused Brenda "emergency" treatment in violation of Health and Safety Code section 1317. In late 1978, after receiving notification from Dr. Weaver that he would no longer treat her, Brenda made application to the *regular outpatient dialysis programs* at these two hospitals and was refused—for reasons, as the trial court found, that did not include her race, her indigency, or any actions on the part of Dr. Weaver. It concluded, on the basis of reasoning which we shall discuss later in this opinion, that Brenda's chronic kidney disease did not itself constitute an "emergency" within the meaning of that section.

Finally, the trial court found that Brenda "has freedom of several choices available by which she can be kept away from dangerous drugs and alcohol, helped to stay on a proper dietary regimen, and in all other ways caused to cooperate with those attempting to provide her with care," so that she is "not without means to arrange for her own care." It concluded, after a weighing of the equities, that Brenda "has no legal right to compel medical service from any of the Respondents for chronic or regular care of her kidney problems through dialysis," and so denied her petition for writ of mandate. At the same time, however, the court stayed execution of its judgment and continued in effect its temporary order requiring Dr. Weaver, and BMA, to provide hemodialysis to Brenda on a regular basis pending appeal.[1]

## Discussion

■ We begin our analysis by considering the trial court's conclusion that Dr. Weaver and the clinic with which he is associated have no present legal obligation to continue providing Brenda with dialysis treatment. Brenda does not claim that Dr. Weaver has any such obligation on the basis of the stipulated order that was entered in the prior proceeding, nor could she reasonably do so. The trial court found that she was estopped from so claiming by her frequent violations of the conditions contained in that order, and that finding is amply supported by the evidence.

---

[1]Dr. Weaver initially appealed from this order, and then sought relief through petition for writ of supersedeas. On February 20, 1981, this court granted the supersedeas petition, but on March 11, 1981, the Supreme Court ordered that the June 30, 1980, trial court order should stay in effect during the pendency of the appeal. Since the trial court's order will cease to have effect once our opinion becomes final, it is unnecessary for us to consider it as an independent subject of review.

Rather, Brenda relies upon the general proposition that a physician who abandons a patient may do so "only . . . after due notice, and an ample opportunity afforded to secure the presence of other medical attendance." (*Lathrope v. Flood* (1901) 6 Cal.Unrep. 637, 639 [63 P. 1007, 1008], revd. on other grounds (1902) 135 Cal. 458 [67 P. 683]; see also *Capps v. Valk* (1962) 189 Kan. 287 [369 P.2d 238]; *McGulpin v. Bessmer* (1950) 241 Iowa 1119 [43 N.W.2d 121, 125]; *Johnson v. Vaughn* (Ky. 1963) 370 S.W.2d 591, 596.)

The trial court found, however, that Dr. Weaver gave sufficient notice to Brenda, and discharged all his obligations in that regard, and that finding, also, is amply supported. Dr. Weaver supplied Brenda with a list of the names and telephone numbers of all dialysis providers in San Francisco and the East Bay, and it is apparent from the record that nothing would have pleased him more than to find an alternative facility for her, but there is no evidence that there is anything further he could have done to achieve that goal under the circumstances.

During the proceedings, the trial court observed that Dr. Weaver "is one of the most sensitive and honest physicians that I have been exposed to either in a courtroom or out of a courtroom," that he was "in fact sensitive to [Brenda's] needs, that he has attempted to assist her to the best of his medical abilities, that he continues to have concern for her as a person and has continued to serve her medical needs," and that "[t]he man has the patience of Job." It appears that Dr. Weaver has behaved according to the highest standards of the medical profession, and that there exists no basis in law or in equity to saddle him with a continuing sole obligation for Brenda's welfare. The same is true of the clinic, the BMA.

■ We turn now to Brenda's contention that Herrick and Alta Bates Hospitals violated their obligations under Health and Safety Code section 1317, the text of which is set forth in the margin,[2] by denying her admission to their regular outpatient dialysis programs in late 1978. The trial court found that at the time Brenda applied for admis-

---

[2]Health and Safety Code section 1317 provides in pertinent part: "Emergency services and care shall be provided to any person requesting such services or care, or for whom such services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when such health facility has appropriate facilities and qualified personnel available to provide such services or care."

sion to these programs she was not in an "emergency condition," by which the court obviously meant that she was in no imminent physical danger on the day she applied. Brenda contends, however, that her illness is itself "a chronic/acute emergency which requires that she receive medical treatment every third day to avoid death," and that such a condition qualifies for mandated service under section 1317.

The trial court, in response to Brenda's contention, found that a patient with end stage renal disease "will not become a medical emergency if that person obeys medical orders, avoids drug abuse and appears for and has regularly scheduled hemodialysis treatments," and that regular outpatient dialysis treatment requires expertise and equipment not normally found in emergency rooms. It concluded that a chronic requirement for continued dialysis treatment does not constitute a need for "emergency" services or care within the meaning of section 1317. It declared, in that connection, that should Brenda present herself at any emergency department of any of the respondent health care providers claiming a need for emergency care, "a determination shall be made at that time by qualified physicians to see whether her condition constitutes an emergency" and, if so, she would be entitled to medical services under section 1317. Since that was not the situation at the time of Brenda's application to the two hospitals, the court found no liability.

We agree with the trial court's conclusion. While end stage renal disease is an extremely serious and dangerous disease, which can create imminent danger of loss of life if not properly treated, the need for continuous treatment as such cannot reasonably be said to fall within the scope of section 1317. There are any number of diseases or conditions which could be fatal to the patient if not treated on a continuing basis. If a patient suffering from such a disease or condition were to appear in the emergency room of a hospital in need of immediate life-saving treatment, section 1317 would presumably require that such treatment be provided. But it is unlikely that the Legislature intended to impose upon whatever health care facility such a patient chooses the unqualified obligation to provide continuing preventive care for the patient's lifetime.

■ It does not necessarily follow that a hospital, or other health care facility, is without obligation to patients in need of continuing medical services for their survival. While it has been said that "[a] private hospital owes the public no duty to accept any patient not desired by it, and it is not necessary to assign any reason for its refusal to ac-

cept a patient for hospital service" (41 C.J.S. Hospitals, § 8, p. 345; see *Birmingham Baptist Hospital* v. *Crews* (1934) 229 Ala. 398 [157 So. 224, 225]; cf. *Wilmington General Hospital* v. *Manlove* (1961) 54 Del. 15 [174 A.2d 135]), it is questionable whether a hospital which receives public funding under the Hill-Burton Act (42 U.S.C. § 291), and perhaps from other sources, can reasonably be said to be "private" in that sense. (Cf. *Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 512-513 [119 Cal.Rptr. 507].) Rather, where such a hospital contains a unique, or scarce, medical resource needed to preserve life, it is arguably in the nature of a "public service enterprise," and should not be permitted to withhold its services arbitrarily, or without reasonable cause. (Cf. *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 482-483 [156 Cal.Rptr. 14, 595 P.2d 592]; see also *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900]; *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 98-100 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]; Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, *passim.*) And, while disruptive conduct on the part of a patient may constitute good cause for an individual hospital to refuse continued treatment, since it would be unfair to impose serious inconvenience upon a hospital simply because such a patient selected it, it may be that there exists a *collective* responsibility on the part of the providers of scarce health resources in a community, enforceable through equity, to *share* the burden of difficult patients over time, through an appropriately devised contingency plan.

Whatever the merits of such an approach might be in a different factual context, however—and we recognize that it poses difficult problems of administration and of relationship between hospitals and physicians—it cannot serve as a basis for imposition of responsibility upon these respondents under the circumstances present here. Apart from the fact that the record does not demonstrate to what extent respondent hospitals are the sole providers of dialysis treatment in the area accessible to Brenda, her present behavior, as found by the trial court, is of such a nature as to justify their refusal of dialysis treatment on either an individual or collective basis. Whatever collective responsibility may exist, it is clearly not absolute, or independent of the patient's own responsibility.

What we have said to this point is analytically sufficient to dispose of Brenda's legal arguments, and thus to sustain the trial court's ruling,

but the circumstances are such that we cannot responsibly avoid confronting the more fundamental question posed by Brenda's challenge, and considered at some length by the parties in their briefs and at oral argument, namely: what alternatives exist for assuring that Brenda does not die from lack of treatment as a result of her uncooperative and disruptive behavior.

One possibility which has been considered is an involuntary conservatorship under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5350 et seq.). Such a conservatorship is appropriate in the case of persons "gravely disabled as a result of mental disorder or impairment by chronic alcoholism" (§ 5350). The County of Alameda has apparently determined, however, that the conditions of that statute cannot be met in Brenda's case.[3]

A second possibility is an involuntary conservatorship under the provisions of Probate Code section 1801 et seq. Under section 1801, subdivision (a), "[a] conservator . . . may be appointed for a person who is unable properly to provide for his or her personal needs for physical health, food, clothing, or shelter." Such a conservator "may consent to medical treatment to be performed upon the conservatee, and may require the conservatee to receive such medical treatment, in any case which the conservator determines in good faith based upon medical advice that the case is an emergency case in which the medical treatment is required . . . ." (Prob. Code, § 2354, subd. (c); see also § 2354, subd. (a).) This possibility remains a viable alternative.

A third possibility, and the one which appears from recent developments to be the most promising, is a voluntary conservatorship under Probate Code section 1802. While Brenda has heretofore resisted consenting to such a conservatorship, her attorneys advise us in a postargument declaration that they are willing to use their influence to persuade Brenda to consent and that they believe they can arrange for her placement in a private, closed psychiatric facility. They suggest that

---

[3]This determination is reflected in a letter to the trial court which, though not formally part of the record, has been referred to by the parties in their briefs and at oral argument.

The County of Alameda has not been a party to this litigation. In support of the writ of supersedeas in the Supreme Court, Dr. Weaver and BMA moved to join the county as a necessary party, but that motion was denied. We consequently express no views as to the responsibilty of the county in this matter, or as to the propriety of its determination.

we remand the matter to the superior court for the institution of appropriate proceedings. Respondents also appear to consider a voluntary conservatorship the best approach.

We have no authority to "remand" for the institution of a voluntary conservatorship, as Brenda's attorneys suggest. The trial court's order requiring Dr. Weaver to provide dialysis treatment to Brenda pending appeal will, however, remain in effect until our decision becomes final. If, during that period, Brenda institutes proceedings for a voluntary conservatorship, and a conservator is appointed, it will be that person's obligation to arrange for continued treatment under statutory authority, and subject to such conditions as the court may impose.[4] The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied May 26, 1982, and appellant's petition for a hearing by the Supreme Court was denied June 23, 1982.

---

[4]Brenda's attorneys, recognizing that a conservatorship will not automatically solve the problem of continued treatment, propose that Dr. Weaver be ordered to provide Brenda with dialysis "until he can, by the use of his resources, arrange for an orderly transfer to another physician." This we are not disposed to do. As we have indicated, Dr. Weaver has already fulfilled his obligations to Brenda, and more. It appears from the record and from the briefs of the parties, however, that other resources may be available.