[Civ. No. 26891. Fourth Dist., Div. One. May 14, 1984.]

BAY GENERAL COMMUNITY HOSPITAL, Plaintiff and Appellant, v. COUNTY OF SAN DIEGO et al., Defendants and Respondents.

946

948

COUNSEL

Bauer & Schultz, William J. Bauer, George J. Schultz, Jack M. Sleith, Jr., and Richard A. Wood for Plaintiff and Appellant.

Bruce Iwasaki, Maria Rodriguez, Mark Rosenbaum, Gary Cary, Ames & Frye and Harold C. Pope as Amici Curiae for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Howard P. Brody, Chief Deputy County Counsel, and Phillip L. Kossy, Deputy County Counsel, for Defendants and Respondents.

Alan K. Marks, County Counsel (San Bernardino), Charles J. Larkin, Deputy County Counsel, Floyd R.B. Viau, County Counsel (Fresno), and James B. Waterman, Assistant County Counsel, as Amici Curiae, on behalf of Defendants and Respondents.

OPINION

STANIFORTH, J.—Bay General Community Hospital's second amended complaint (complaint) is in the nature of a class action on behalf of all hospitals similarly situated in San Diego County (collectively, the Class or Bay General) and as assignee of the rights of an individual hospital patient, Feliciano Moreno Rios. Joined as defendants were the County of San Diego and the San Diego County Board of Supervisors (Board of Supervisors) as a group and as individuals (collectively, the County).

Bay General's action explores the parameters of Welfare & Institutions Code sections 17000 and 17003 and Government Code section 29606 and seeks to compel the County (1) to reimburse the various private hospitals (the Class) for emergency medical care provided indigent residents and non-residents of San Diego County (i.e., to abandon its no-reimbursement policy); (2) to accept transfer to University of California-operated university

hospital of those indigent patients who were taken in by and treated for an emergency medical condition at a Class hospital (i.e., to abandon its policy of no-transfer of medically stabilized indigent patients from private hospitals to university hospital, the County-subsidized hospital); (3) to modify in some unspecified way its criteria for determining indigency and admission of undocumented aliens and the "working poor" to County-supported hospital care. In its fourth cause of action, Bay General seeks to recover money in its individual capacity as assignee of Rios, an undocumented alien who was injured in an automobile accident near that hospital. Rios received medical services at Bay General in the monetary value of $11,225.25. These sums were not paid by Rios and have not been reimbursed by the County.

At the outset of the trial, the trial court granted the County's motion for judgment on the pleadings with respect to the fourth (Rios) cause of action on the ground of lack of standing. Trial then proceeded on the sole issue of "liability." ■ ■ ■ ■ After hearing the evidence the court granted defendants' motion for judgment pursuant to Code of Civil Procedure section 631.8.[1] The court found no showing of fraud or arbitrary or capricious conduct concerning eligibility for or availability of indigent health care. Bay General appeals.

FACTS

For many years before 1966 the County owned and operated a county hospital. During that era, other hospitals (the Class here) were allowed to transfer an emergency patient to the county hospital once the patient's condition was stabilized. If the transferred patient was determined to be indigent, the transferring hospital was reimbursed by the County for the cost of emergency medical treatment.

In July 1966, the University of California Board of Regents leased the county hospital and thereafter operated it as university hospital. From July 1966 to December 1972—when Medi-Cal regulations came into effect—University Hospital followed the same transfer and reimbursement policies as had its predecessor county hospital. Indigent emergency care patients were allowed to be transferred to university hospital and the County reimbursed the transferring hospital, as well as university hospital, for medical care rendered these patients.

---

[1] Our review of the trial court's decision, made pursuant to Code of Civil Procedure 631.8, is governed by the substantial evidence rule. *Canales* v. *Alviso* (1970) 3 Cal.3d 118, 126 [89 Cal.Rptr. 601, 474 P.2d 417]; *Swanson* v. *Skiff* (1979) 92 Cal.App.3d 805, 811 [155 Cal.Rptr. 280].

In 1972 the County enacted certain procedural and policy regulations relating to County reimbursement for indigent emergency care which:

1. Refused reimbursement for medical care of any indigent emergency patient who received emergency medical care at a hospital other than university hospital (the no-reimbursement policy);[2]

2. Refused reimbursement to university hospital for the emergency medical treatment of any indigent who was first treated at any other hospital in the County and then transferred to university hospital after stabilization (the no-transfer policy);[3]

3. Set financial standards of indigency which mirror Medi-Cal financial criteria. As a consequence any person who is determined to be indigent according to County indigency standards is, ipso facto, eligible for Medi-Cal (the financial component of the County indigency criteria);

4. Adopted a definition of the term "lawful residence" in reliance upon Welfare and Institutions Code section 17000[4] which excludes all persons whom the County believes to be undocumented aliens from provision of emergency medical services (the residence component of the County indigency criteria).[5]

---

[2]Bay General states there is a common practice among ambulance companies to transport persons requiring emergency medical services to the nearest hospital capable of providing that service. This very rational practice can result in an appropriately located hospital being the recipient of an inordinate number of emergency patients. The university hospital by luck of location may receive very few.

[3]Until January 1981, the County refused to reimburse university hospital for care of *all* patients received by university hospital from another area hospital. This policy was subsequently modified to authorize reimbursement to university hospital for indigent patients who are transferred there for reasons of "medical necessity" (usually severe burn or neonatal care cases). In view of the fact university hospital is not reimbursed for treatment of indigent transfer patients, except those whose transfer is "medically necessary," university hospital's willingness to accept transfers has been lacking. The County however stipulated if university hospital were to receive more money from the County to treat indigents, university hospital would, indeed, accept more transfers from other area hospitals. The incidence of "medically necessary" transfers is minimal. Margaret Swanson, the primary person responsible for determining eligibility of patients at University Hospital for County reimbursement, testified she had never seen a "medically necessary" transfer.

[4]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[5]The County represents the determination of undocumented status is made on the basis of statements of the patient as to citizenship and documentation. Undocumented aliens do receive emergency medical care at university hospital under statutory authorization of section 17003, which provides: "Every county may give such emergency relief to dependent nonresidents as their respective boards of supervisors deem necessary."

Conformable to the foregoing policies and procedures the County only reimburses for emergency medical treatment given:

(a) Persons who originally enter university hospital in an emergency condition, who even if the County believes them unable to meet the residency component, meet the financial component of the County criteria for receipt of indigent medical care;

(b) Prisoners treated at University Hospital and, on very rare occasions, prisoners treated at other county hospitals;

(c) Persons initially treated for emergency conditions at university hospital who are eligible for Medi-Cal, but who are so incapacitated due to drugs, alcohol or mental deficiencies that they are unable to complete the Medi-Cal process;

(d) Persons transferred to university hospital out of "medical necessity" as described *supra.*

The County estimates the annual cost of indigent care presently shouldered by the Class at approximately $2 to $4 million. The County has no procedures whereby members of the Class may petition the County for reimbursement for indigent medical care they render. The County has no records which in any way reflect payments made by the County for *indigent* emergency care provided pursuant to section 17000.

In summary, the County presently pays for emergency medical care only for those indigent patients who are treated at university hospital and who satisfy the financial component of the County's indigency standards. At present, whether a person is a "resident" does not enter into the County's decision to reimburse university hospital for treatment of indigent patients.

DISCUSSION

I

THE NO-REIMBURSEMENT POLICY

Bay General contends the County has a mandatory, statutory obligation to reimburse it and every member of the Class for costs of emergency medical care the Class delivers to indigents. This contention is primarily based upon section 17000 and Government Code Section 29606. Section 17000 provides: "*Every county* and every city and county *shall relieve and*

*support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by* their relatives or friends, by their own means, or by state hospitals or other state or *private institutions."* (Italics added.) Section 29606 provides: "The necessary expenses incurred in the support of the county hospitals, almshouses, and the indigent sick and otherwise dependent poor, whose support is chargeable to the county, are county charges."

The board of supervisors of each county is required by section 17001 to adopt standards of aid and care for county indigents. Section 17003, also pertinent here, provides: "Every county may give such emergency relief to dependent nonresidents as the respective boards of supervisors deem necessary."

Finally, section 17107 provides: *"The board of supervisors may establish its own policies with reference to the amount of property, if any, a person shall be permitted to have while receiving assistance,* to the end that, so far as it is possible, an applicant for public relief shall be required to apply his own property to his support." (Italics added.)

The Supreme Court declared in *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231]: (1) "Section 17000 imposes a mandatory duty upon the counties to support 'all incompetent, poor, indigent persons, and those incapacitated by age, disease or accident'." (*Id.,* at p. 676; see also *County of San Diego* v. *Viloria* (1969) 276 Cal.App.2d 350, 352 [80 Cal.Rptr. 869].) (2) Section 17001 places on the County a mandatory duty to implement the section 17000 directive with compatible regulations. (3) The obligation imposed by section 17000 is not necessarily satisfied by the existence of other specialized relief programs. In *Mooney* v. *Pickett, supra,* 4 Cal.3d at page 681, it is stated, "[G]eneral assistance . . . remains the residual fund from which indigents who cannot qualify for and under any specialized aid programs can still obtain the means of life." (4) The eligibility criteria imposed must carry out the objectives of the enabling legislation. (5) Regulations that arbitrarily exclude a class from eligibility for general assistance are invalid. (*Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77, 92 [88 Cal.Rptr. 907, 43 A.L.R.3d 537], *disapproved on another point in Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 677 [170 Cal.Rptr. 484, 620 P.2d 1032].) (6) When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific, or carry out its provision those regulations must be consistent with the statute and must be reasonably necessary to effectuate the legislative purpose. (7) Finally, financial difficulty does not excuse failure to meet the mandatory obligation imposed by section 17000. That the County "cannot afford to [relieve and support its indigents] is unavailing." (*City and County*

*of San Francisco* v. *Superior Court* *(Long)* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712].)

■ Does the County's no-reimbursement policy violate the "mandatory" section 17000 duty invoked? This court stated in *Patten* v. *County of San Diego* (1951) 106 Cal.App.2d 467, 470 [235 P.2d 217]: "The administration of county general relief given pursuant to section 2500 of the Welfare and Institutions Code [now § 17000] is vested in the county boards of supervisors. . . . These are matters within the discretion of the board of supervisors and the court has no authority to interfere with the administrative determination of a board of supervisors with respect to the granting of county general relief in the absence of a clear showing of fraud or arbitrary or capricious conduct."

In their discharge of this statutory duty, county supervisors have discretion to determine eligibility for, the type and amount of and conditions to be attached to indigent relief. (*Adkins* v. *Leach* (1971) 17 Cal.App.3d 771, 779 [95 Cal.Rptr. 61]; *City & County of San Francisco* v. *Superior Court* *(Long)*, *supra,* 57 Cal.App.3d 44, 50.) As the Supreme Court said in *Mooney* v. *Pickett, supra,* 4 Cal.3d at page 680: "[T]he county retains extensive authority to establish standards for General Assistance both as to eligibility and as to amount of aid."

Bay General offers no case in point which would compel the County to reimburse the Class for rendering emergency medical care to indigents but relies upon a claimed to be analogous case, *St. Joseph's Hospital & Medical Center* v. *Maricopa County* (1981) 130 Ariz. 239 [635 P.2d 527]. This case is inapposite. Arizona statutory law, Ariz. Rev. Stat. Ann. § 11-297.01(B), provides a "county shall be liable for payment of all costs retroactive to the inception of treatment incurred by a private hospital . . . arising from emergency treatment and medical care administered at such hospital for a patient qualified for such care."

The California Legislature has made clear that boards of supervisors have wide discretion in providing for indigent medical care. Section 1441 of the Health and Safety Code authorizes but does not require the establishment of county hospitals. Section 1443 also allows for the provision of transportation of the needy sick. Section 1445 directs the board of supervisors "may provide for the care and maintenance of the indigent sick or dependent poor of the county." The language of each of these sections indicates the discretionary nature of the board's determinations. These statutes disclose the key element of discretion is vested with each county board of supervisors. There is no legislation in California which parallels that found in Arizona autho-

rizing the payment of a claim by a private hospital against an Arizona County.[6]

In substance the County has chosen to fund care for indigent medical emergency patients at a single site, to wit, university hospital. The Class seeks to compel the County to enter into contracts with hospitals other than the university hospital for these same services.

 Since there is no contractual privity, does the mandatory section 17000 duty encompass County *reimbursement* of the Class for Class-provided indigent emergency services? In the recent case of *Union of American Physicians & Dentists* v. *County of Santa Clara* (1983) 149 Cal.App.3d 45 [196 Cal.Rptr. 602], certain physicians sought to compel Santa Clara County to compensate them for the reasonable value of services rendered patients eligible for county services under section 17000. The physicians sought compensation without prior agreement. The appeal court held:

"[A] county is not liable to pay any claim for services rendered except those whose payment is authorized by law.

"Physicians contend that Welfare and Institutions Code section 17000 authorizes their claims. Obviously, section 17000 does not expressly authorize the payment of compensation for noncontractual emergency relief provided to indigent residents. Section 17000 does impose a mandatory duty [citation] of the type contemplated by sections 113 and 114 of the Restatement of Restitution. . . . However, the establishment of such duty does not itself constitute the specific authority necessary to maintain a quasi-contract cause of action against a county.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Thus, *there is no specific statutory authority under which a county may be compelled to entertain or pay noncontractual claims by private physicians for expenses incurred in providing emergency medical services to indigent residents.*

". . . . . . . . . . . . . . . . . . . . . . . . .

"[I]f a county fails to perform its duty, the remedy is not to impose liability for individual claims, but to require it to fulfill its obligations to

---

[6]But see Government Code section 29602 which expressly authorizes private hospital reimbursement for emergency care provided a prisoner.

the indigent, who are the class of persons benefited under section 17000."
(*Id.* at pp. 50-53; citations and fns. omitted.)

The Legislature has confirmed this judicial position. In section 16717 (an urgency measure effective September 30, 1982) provided, inter alia, ". . . [a] county shall not be obligated to pay for health care services unless pursuant to a contract or the county has specifically authorized such services and agreed to payment." We conclude that the County is under no obligation to pay for indigent care delivered at a facility other than its own or one with which it has contracted.[7]

This lack of any legal duty on the County's part to pay noncontracting third parties for indigent emergency care rendered must be viewed in light of the correlative duty imposed by Health and Safety Code section 1317 on every health care facility licensed by the State of California rendering emergency medical services. The statutory language is mandatory: *"Emergency service and care shall be provided."* (Health & Saf. Code, § 1317; italics added.) If an indigent person (any person) requests emergency services of a licensed health facility—which includes all Class members—and the indigent's condition is found to be a medical emergency, such person is entitled to medical services under section 1317. (See *Payton* v. *Weaver* (1982) 131 Cal.App.3d 38, 46 [182 Cal.Rptr. 225].)

Private hospitals are governed not only by section 1317 but may also have legally enforceable federal contract obligations to provide medical services to indigents. Under Title VI of the Federal Health Services Act as amended (42 U.S.C. § 291 et seq.) grants and loans are made for the construction or modernization of hospitals and medical facilities upon the assurance that "a reasonable volume of services [will be made available] to persons unable to pay therefor." (42 U.S.C. § 291c(e).) The commitment of such funds, com-

---

[7]As early as 1961 the Attorney General had issued an opinion declaring: "'It seems a reasonable requirement that indigents, in order to qualify for county medical care, must seek admission to either the county hospital or the private hospital with which the county has contracted to provide such care. *Having taken reasonable measures to discharge its duty toward the indigent sick, the county does not become a guarantor to all other hospitals, public or private, for the care of those indigents who for one reason or another find their way into those hospitals.* It is true that other hospitals for humanitarian, ethical, medical, or legal reasons may feel that they are unable to deny admission to those indigents who apply, or are unable to safely transfer such patients after admission to facilities owned or under contract to the county. However, this would appear to be one of the hazards of the hospital business against which the county has no legal obligation to protect these hospitals. . . .'" (37 Ops.Cal.Atty.Gen. 41, 43; italics added.)
The Attorney General concluded: "'[I]t is within the discretion of the county board of supervisors to determine whether reasonable steps have been taken by the county to care for the indigent sick.'" (*Id.* at p. 44.)

monly referred to as "Hill-Burton funds," is intended to provide indigent medical services to the needy.

 Under current law[8] the County's refusal to reimburse or to contract with more than one hospital for provision of indigent care is not in violation of its section 17000 duty or other statutory or common law duty.

Finally, a vast majority of indigents receive emergency medical care fi-. nanced by federal and state government under the Medi-Cal Act. (§ 14000 et seq.) The Class is in no way excluded from monetary recovery for medical emergency or long term care rendered indigents who meet Medi-Cal standards.

## II

### THE NO-TRANSFER POLICY

Before December 17, 1980, the County not only refused to reimburse for medical care rendered any indigent patient other than at university hospital but also *refused to reimburse University Hospital for care provided all emergency patients transferred by the Class to university hospital.* Since January 1981 (the date of sale of university hospital to the Board of Regents of the University of California), the County has agreed to reimburse university hospital for emergency care given indigent patients transferred to university hospital out of "medical necessity," i.e., where the treating hospital does not have the proper medical facilities to render appropriate care and university hospital does. (Principally, burn victims and neonatal cases require care only university hospital is equipped to provide.) The County's no-transfer policy is equally applicable to resident indigents and to undocumented aliens or nonresident indigents who are not initially treated at university hospital.

The effect of this rule, Bay General argues, is to require the Class to furnish not only emergency medical care in a life threatening situation, but

---

[8]Senate Bill No. 1525 (which was introduced February 1, 1984), would repeal Government Code section 29607.5 and amend section 16717. The proposed amendment to section 16717 states, in pertinent part: "A county shall not be obligated to pay for health care services unless provided pursuant to contract, or the county has specifically authorized the services and agreed to the payment, except that the county shall be obligated to pay for the reasonable value of health care services provided when the charges are incurred because the county has failed to fulfill its obligations to furnish reasonably accessible emergency care, or otherwise failed to meet its statutory obligations to furnish health care."

This bill supports the general proposition courts may not obligate a county to pay for indigent care delivered at a facility with which the county has no contract. It does permit, however, judicial imposition of such an obligation where the county has failed to meet its statutory obligations.

also continued, nonemergency care after the medical crisis has subsided. The County is adamant in its refusal to reimburse university hospital for costs incurred upon transfer of a patient first cared for in a Class emergency room whose medical condition has stabilized such that an "emergency" no longer exists.

In oral argument on this issue, Bay General assumed the Class has a statutory (Health & Saf. Code, § 1317) duty to act as good Samaritan to emergency patients. Bay General proceeded to argue, however, when the emergency ends, the duty ends also, the mandatory section 17000 County obligation is triggered, and the County facility should then accept medically stable, indigent patients. In short, Bay General objects to the continued providing of indigent medical care after the patient's emergency condition has stabilized.

The issue of an after-emergency duty on "private" hospitals was discussed in *Payton* v. *Weaver, supra,* 131 Cal.App.3d 38. The appeal court said as to the obligation to provide nonemergency treatment to patients needing long-term hospital care for survival: "[A] *hospital, or other health care facility, is [not necessarily] without obligation to patients in need of continuing medical services for their survival.* While it has been said that '[a] private hospital owes the public no duty to accept any patient not desired by it, and it is not necessary to assign any reason for its refusal to accept a patient for hospital service' (citations), it is questionable whether a hospital which receives public funding under the Hill-Burton Act (42 U.S.C. § 291), and perhaps from other sources, can reasonably be said to be 'private' in that sense. Rather, where such a hospital contains unique, or scarce, medical resources needed to preserve life, it is arguably in the nature of a 'public service enterprise,' and should not be permitted to withhold its services arbitrarily, or without reasonable cause." (*Id.* at pp. 46-47; italics added.)

Is there a violation of section 17000, an abuse of discretion in the County's refusal to authorize university hospital to admit unlimited indigent transfers from Class hospitals? This refusal to accept transfers must be viewed in the light of (1) the County's mandatory section 17000 duty to furnish *medical care*—not just emergency care—to "lawful residents" and (2) the private hospital's own statutory responsibility under Health and Safety Code section 1317 and under the Hill-Burton Act.

 The no-transfer policy of the County is in derogation of the section 17000-imposed duty to care for indigent nonemergency resident ill persons who apply for admission to university hospital. The nature and extent of the *County's* duty to accept transfers of indigent residents is not alleviated

by section 1317. As the *Payton* court noted: "There are any number of diseases or conditions which could be fatal to the patient if not treated on a continuing basis. If a patient suffering from such a disease or condition were to appear in the emergency room of a hospital in need of immediate life-saving treatment, section 1317 would presumably require that such treatment be provided. *But it is unlikely that the Legislature intended to impose upon whatever health care facility such a patient chooses the unqualified obligation to provide continuing preventive care for the patient's lifetime.*" (131 Cal.App.3d at p. 46; italics added.) Section 1317 mandates the private hospital's provision to indigents of "emergency service and care" only. The Hill-Burton Act more broadly directs private hospitals in receipt of Hill-Burton funds to provide "a reasonable volume of services to persons unable to pay therefor." (42 U.S.C. 291c(e).) As between the County and private hospitals, however, the overall statutory scheme places the primary obligation to provide care to medically stabilized, indigent County residents on the County. The County's no-transfer policy therefore facially represents an impermissible exercise of section 17001 discretion in derogation of the County's mandate to provide medical care to indigent residents.

Such a conclusion does not require reversal for the effect of such a policy results in a *damnum absque injuria* situation. There is or may be a legal wrong here but there can be no showing of injury. This paradox arises where the no-transfer policy is conjoined with the eligibility standards established by the County. We turn now to examine those criteria.

## III

### The Eligibility Policy

#### A.

#### The "Working Poor"

Bay General contends the County has abused its statutory discretion by setting the financial eligibility standard for County care at the same level as the Medi-Cal financial eligibility standard. It contends that policy excludes needy sick persons who, though not eligible for Medi-Cal under income and property tests, should be eligible for County-paid care under section 17000.

Bay General argues the County in enacting financial standards for indigency identical to those of Medi-Cal has created a unique loophole to section 17000 in that anyone indigent by County decreed standards is also eligible for Medi-Cal. Therefore, argues Bay General, the County has shunned its

responsibility to pay for medical care of the working poor. The only individuals whose medical care is actually paid for by the County under section 17000 are those few individuals who are incapable of completing the Medi-Cal forms—approximately 60 drug or alcohol abusers per year. Bay General asserts the indigency standards adopted are a capricious attempt by the County to evade its responsibility to the poor as well as to Bay General and the Class.

As a direct result of this policy, the Class contends it is forced to bear a disproportionate burden of the cost of medical care of those unable to pay, including (1) the working poor, i.e., those individuals who are above Medi-Cal cut off limits but cannot pay for their own medical care and (2) undocumented aliens.

The Medi-Cal program was substantially adopted in 1965. The Legislature declared its purpose as follows: "The purpose of [Medi-Cal] is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary for those receiving health care under this chapter. [This includes] *family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security.*" (§ 14000; italics added.)

■ In adopting the Medi-Cal program the state Legislature, for the most part, shifted indigent medical care from being a county responsibility to a State responsibility under the Medi-Cal program. (See *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 642 [106 Cal.Rptr. 555].)

Medical indigency and eligibility under Medi-Cal standards are *generally* defined by the Legislature in section 14005.1 et seq. The County concedes there are "residual" indigents who do not qualify for Medi-Cal. However, the County has broad discretion in defining an "indigent." One of the purposes of California public social services, including both Medi-Cal and county general relief, is "[t]o provide on behalf of the general public, and within the limits of public resources, reasonable support and maintenance for needy and dependent families and persons." (§ 10001.) Such a balance between needs and finite public resources obviously is a political question solely within the legislative and executive realms.

■ The Board of Supervisors is vested with broad discretion in setting eligibility standards (see § 17001). The County has not clearly and palpably

violated the bounds of sound discretion in adopting the Medi-Cal standard for purposes of County-paid medical care under Section 17000.[9]

· The County has not acted fraudulently, arbitrarily, or capriciously by defining indigency in the same way as does the state. A county's responsibility extends only to indigents as defined within its board of supervisors' sound discretion. While nothing precludes that definition from including the "working poor," nothing compels it either. The statutes and regulations at issue are the product of state and county legislative processes. Bay General's remedy is in the political arena.

■ This conclusion of lawfulness of the indigency standard in effect negates any claim of harm flowing to the *Class* where the County enforces its no-transfer policy. In sum, the private hospital will have to seek recovery from the working poor's assets which elevate them above the Medi-Cal cut off level. This is a harsh divestiture process but the remedy is legislative action. When the poor persons' assets are exhausted then Medi-Cal benefits are theoretically available to the patients for continued, needed nonemergency care in a private hospital. That the County will not accept transfer to university hospital of such patients and of Medi-Cal qualified patients results in no injury to the private hospitals rendering long term care; the hospitals are reimbursed by one process or another for such care.

### B.

### Undocumented Aliens

■ Bay General and amici curiae urge this court to find and declare the *undocumented* indigent alien has a right to emergency medical care under section 17000 and a right in the Class for reimbursement for crisis medical care given such persons. For answer we return again to the statutory language. Section 17000 directs the County to "relieve and support all. . .indigent persons, and those incapacitated by age, disease, or accident, *lawfully resident* therein." (Italics added.) The County, in reliance on the underscored language, has determined it has no 17000 duty to provide emer-

---

[9]This court is aware of other broader definitions of indigency. See *Madison* v. *City and County of San Francisco* (1951) 106 Cal.App.2d 232, 247-248 [234 P.2d 995], where it was said: "The word 'indigent,' when used in connection with admissions to county hospitals, was defined by the court in the *Goodall* [*Goodall* v. *Brite,* 11 Cal.App.2d 540, 549 (54 P.2d 510)] case as including a person 'who has insufficient means to pay for his maintenance in a private hospital after providing for those who legally claim his support.' . . . That, we believe, is the meaning of the expression 'unable to pay for her necessary care' as used by the Legislature in Section 204 of the Welfare and Institutions Code." (Citation omitted.)

gency medical care to undocumented indigent aliens. It does furnish such care pursuant to discretionary section 17003, but only to undocumented indigent aliens initially treated at University Hospital.

We cannot find the County has exceeded the bounds of sound discretion in determining section 17000 does not require county-underwriting of undocumented indigent alien medical care. The County has not unreasonably construed the statute in this regard.

At the heart of Bay General's request is a demand the County underwrite private hospitals' responsibilities owed under Health and Safety Code section 1317. Whether a person is a documented or undocumented alien or a resident or nonresident citizen who applies for emergency medical services at one of the Class hospitals, the duty of the private hospital is exactly the same under the Hill-Burton Act or under section 1317 of the Health and Safety Code. Emergency care must be rendered. Private hospitals have no greater entitlement to reimbursement for hospital services rendered an undocumented alien than they have when a resident citizen applies to their hospital for emergency medical care as an indigent.

The County now provides undocumented indigent aliens with County-paid emergency medical care at University Hospital. The care is furnished to these nonresident aliens under the discretionary section 17003. Since emergency medical care is not refused undocumented aliens, equal protection in a medical sense has not been denied; the duty owed by the County to noncitizen indigent sick persons has not been abandoned. Both reason and substantial evidence support a conclusion the County has not abused its discretion in performing its duties under section 17000 or 17003 with regard to rendering of emergency medical care to indigent undocumented aliens.

With regard to long term care of stabilized, undocumented indigents alien patients, it may well be *unfair* that the Class must shoulder the costs of such care.[10] However, the Legislature has not imposed this burden on the County

---

[10]Until 1982, undocumented indigent aliens were entitled, pursuant to then-section 11104, to Medi-Cal benefits until officially ordered deported. (See *Dermegerdich* v. *Rank* (1984) 151 Cal.App.3d 848 [199 Cal.Rptr. 30].)

Present section 11104 reads: "Aliens shall be eligible for aid only to the extent permitted by federal law. An alien shall only be eligible for aid if the alien has been *lawfully admitted for permanent residence, or is otherwise permanently residing in the United States under color of law.* No aid shall be paid unless evidence as to eligible alien status is presented." (Italics added.)

The Class therefore will not be reimbursed by Medi-Cal for costs of care of undocumented indigent aliens. Those who will actually pay for such care are a small portion of this county's population—the paying patients at Class hospitals. As Justice Marshall described the situa-

and this court is powerless to do so at the present time, on the basis of the facts now before us.[11] The County has no *duty* to accept transfer to university hospital of undocumented indigent aliens whose medical conditions have stabilized. (See *Union of American Physicians and Dentists* v. *County of Santa Clara, supra,* 149 Cal.App.3d 45.) Again, Bay General's remedy is in the political arena.

IV

■ In claiming a monetary recovery as assignee of the individual undocumented alien Rios for services rendered, Bay General appears to be arguing the statutory and constitutional rights of the patient. In order to claim infringement of right, the complaining party must show that it is the aggrieved party or a member of the aggrieved class. (*Estate of Horman* (1971) 5 Cal.3d 62, 77-78 [95 Cal.Rptr. 433, 485 P.2d 785]; see also *First Nat. Bank* v. *Louisiana Tax Com.* (1933) 289 U.S. 60, 65 [77 L.Ed. 1030, 1034-1035, 53 S.Ct. 511, 87 A.L.R. 840].)

In the case of *Gladstone Realtors* v. *Village of Bellwood* (1979) 441 U.S. 91 [60 L.Ed.2d 66, 99 S.Ct. 1601], the United States Supreme Court held the "case or controversy" requirement compels the plaintiff and the defendant to allege an injurious relationship between them. The Class and the County have no such relationship which gives rise to a violation of constitutional or statutory rights of an undocumented alien.

If we look at the substance of the charge, there has been no showing of any violation of any right of any alien. There is no evidence a person arriving at university hospital who qualifies under either section 17000 or 17003 standards has been refused County-sponsored emergency care. There is no

---

tion in *Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250, 264-265 [39 L.Ed.2d 306, 318-319, 94 S.Ct. 1076]: "It is also useful to look at the other side of the coin—at who will bear the cost of indigents' illnesses if the county does not provide needed treatment. For those newly arrived residents who do receive at least hospital care, the cost is often borne by private nonprofit hospitals, like appellant Memorial—many of which are already in precarious financial straits. When absorbed by private hospitals, the costs of caring for indigents must be passed on to paying patients and 'at a rather inconvenient time'—adding to the already astronomical costs of hospitalization which bear so heavily on the resources of most Americans." (Fn. omitted.)

[11] As long as private hospitals continue to provide care to undocumented indigent aliens, no public health hazard is posed by the County's refusal to "deem necessary" (§ 17003) the provision of long-term care to this class of indigents. Should the Class determine to stop providing long-term care and the County not respond by accepting a transfer of these patients, the County may well be found to have abused its section 17003 discretion in failing to promote the general welfare and the public health of the community. (See *Madison* v. *City & County of San Francisco, supra,* 106 Cal.App.2d 232.) A tubercular undocumented alien refused long-term, nonemergency care, for example, would most certainly be a most real imminent threat to the public health, the general welfare of this county.

charge that the County reimbursement decision discriminates in any way on the basis of race or immigration status. In short, from the indigent's point of view, whether legally or illegally in the United States, he can and does receive care at university hospital. If he were denied care then a serious breach of duty would arise. However, the rights of the indigent to receive emergency medical treatment at university hospital are not in issue. The County fulfills its constitutional duty by seeing the injured party is taken promptly to a hospital that provides necessary treatment. The allocation of cost for medical services is the issue Bay General presents, and is a matter of state statute, not constitutional law. (*City of Revere* v. *Massachusetts General Hospital* (1983) 463 U.S. 239, 244-245 [77 L.Ed.2d 605, 611, 103 S.Ct. 2979, 2983].) Neither Bay General nor Rios may compel payment from the County for services Rios received. (*Union of American Physicians & Dentists* v. *County of Santa Clara, supra,* 149 Cal.App.3d 45.)

V

Several contentions of error are made regarding admission or exclusion of evidence. The trial court's ruling here was based in broad substance on undisputed facts; any error in admission or exclusion of evidence would of necessity be harmless. We nonetheless address the contentions.

The testimony of Paul O'Rourke appears to have been properly excluded. ■ An expert may not give an opinion on matters of law within the province of the court, to wit: the meaning of indigency under section 17000. (*Carter* v. *City of Los Angeles* (1945) 67 Cal.App.2d 524, 528 [154 P.2d 907].) ■ Bay General sought to introduce testimony the County referred suspect illegal aliens to the immigration authorities. The trial court properly ruled this matter not relevant; it is a totally collateral issue. Additionally, Bay General's proposed testimony concerning the status of illegal aliens and the fact they would avoid care until the need becomes an emergency because of fear of contact with authorities may very well be true; that some aliens pay taxes (further evidence sought to be introduced) is also true, but the relevance of these facts to the question of whether the county must reimburse private hospitals for emergency care rendered is remote to nonexistent.

Disposition

The County has not abused its discretion in refusing to reimburse the Class for emergency medical care rendered indigent patients, or in setting financial eligibility standards for County-paid indigent health care at the same level as Medi-Cal financial eligibility standards. With regard to these

policies, the County has taken not unreasonable measures for the delivery of health care to all the people of San Diego as required by law. The County's policy of refusing to accept transfer of medically-stabilized indigent patients from private hospitals to the County-subsidized hospital does facially represent a violation of the section 17000 duty where long-term medical care is sought for the transfer patient. When, however, such policy is viewed in light of the County's indigency standard and other applicable statutes no wrong has been shown based on the facts tendered in this case.

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for hearing by the Supreme Court was denied August 9, 1984. Broussard, J., was of the opinion that the petiton should be granted.